El Pueblo de Puerto Rico, demandante y apelado, *v.* Leila Nazario, acusada y apelante.

Núms. 6924 y 6947.—*Sometidos:* Abril 7, 1938. *Resueltos:* Mayo 31, 1938.

*Alfonso Lastra Chárriez,* abogado de la apelante; *R. A. Gómez,*
Fiscal, abogado de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del
tribunal.

Estos dos recursos se sometieron por un mismo alegato y
serán considerados en una sola opinión.  Las causas se tra-
mitaron ante la Corte de Distrito de San Juan, comenzando
por acusaciones formuladas por uno de sus fiscales imputando
a Leila Nazario de Martínez por la primera un delito de ase-
sinato cometido el 21 de mayo de 1934, en San Juan, dando
muerte de una manera ilegal y voluntaria, con malicia preme-
ditada y firme y deliberado propósito de matar, al ser humano
Rafaela Pardo, acometiéndola y agrediéndola con un revólver,
infiriéndole varias heridas de bala a consecuencia de las cua-
les falleció el mismo día, y por la segunda un delito de por-
tar armas, consistente en llevar sobre su persona el referido
día, en San Juan, con fines de ofensa y defensa, un revólver
que es un arma cuya portación prohibe la ley.

El 19 de junio de 1934 compareció ante la corte la acusada
en persona, acompañada de su abogado.  Se le leyeron las
acusaciones.  En ambas hizo la alegación de inocente, solici-
tando en la de asesinato juicio por jurado y pidiendo en la
de portar armas que se dictara sentencia por la prueba que
se practicara en la primera.

En enero 29 de 1935 comenzó el juicio por jurados.  Ter-
minó el 2 de febrero siguiente.  El jurado declaró a la acu-
sada culpable de homicidio voluntario.

Fijado día para dictar sentencia, se pidió la posposición
de dicho acto a fin de determinar la defensa el procedimiento
a seguir en vista del veredicto del jurado.  Los abogados que
representaron a la acusada durante el juicio se retiraron, asu-
miendo su representación el letrado Alfonso Lastra Chárriez,
quien en marzo 7, 1935, presentó una moción sobre investi-

gación del estado mental de su representada en diferentes épocas, concesión de un nuevo juicio, y otros extremos.

La corte oyó a ambas partes extensamente sobre la moción y por resolución fundada de abril 11, 1935, la declaró sin lugar, señalando el 17 siguiente para dictar las sentencias y así lo hizo en dicho día, imponiendo a la acusada tres años de presidio por el delito de asesinato y un mes de cárcel por el de portar armas.

Apeladas la resolución de abril 11, 1935, y ambas sentencias, surgieron varios incidentes con motivo de la preparación gratis de la transcripción de las notas taquigráficas, incidentes que dilataron el curso de las apelaciones cuyas vistas se celebraron finalmente el siete de abril último.

Sólo un error se imputa por la apelante en su alegato de sesenta y cuatro páginas, el cometido a su juicio por la corte sentenciadora "al negarse a seguir los caminos que le señalara en su petición intitulada 'Writ of Error Coram Nobis.' "

Dichos caminos fueron:

1. El de la anulación del veredicto a virtud de la prueba médica sometida y de las declaraciones del abogado anterior y del actual de la acusada y de la Viuda de Nazario, madre de la misma, concediendo un nuevo juicio, de acuerdo con los artículos 439 y 303, núm. 6, del Código de Enjuiciamiento Criminal.

2. El de someter la investigación del estado mental de la acusada a un tribunal de peritos, por existir duda substancial sobre su cordura durante la celebración del juicio y al rendirse el veredicto, a fin de que la corte, amparándose en el dictamen técnico que se rindiera, anulara el veredicto y concediera un nuevo juicio. Artículos 440, 441 y 442 del Código de Enjuiciamiento Criminal.

3. Y el de la designación de un tribunal técnico que investigara y resolviera en definitiva sobre el estado mental de la acusada en el instante en que se iba a dictar la sentencia, y si la resolución era en el sentido de que estaba loca, enton-

ces que la corte suspendiera el pronunciamiento de la dicha sentencia de acuerdo con la ley.

El auto de *coram nobis* o *coram vobis* procede de la ley común de Inglaterra. Se expedía para corregir una sentencia por la misma corte que la dictara. Se distingue del auto ordinario de error en que éste se interpone a virtud de algún alegado error de ley que surja de los autos, llevando el caso a un tribunal superior que decide la cuestión y confirma, modifica o revoca la sentencia, mientras que aquél se basa en errores de hecho que no surgen de los autos, dejando el caso en la propia corte sentenciadora que puede corregir el error bajo la presunción de que de haber conocido la realidad de los hechos no lo hubiera cometido.

Aunque debido a la concesión de otros remedios estatutarios que cubren el campo, no es frecuente, aún existe y se ha usado con eficacia en varias ocasiones. En 2 Ruling Case Law 307, 308, al tratar sobre el alcance del auto, se citan los variados casos en que se ha interpuesto. Y allí se dice—basando el texto en casos de Kentucky, Maine, Indiana y West Virginia, reportados en 32 Am. Dec. 68, 74 Am. Dec. 503, 44 Am. Rep. 29, 18 L.R.A. 840 y 19 L.R.A. 762—lo que sigue:

" . . . En lo que se refiere al efecto de la demencia del acusado al momento en que se dictó sentencia en su contra, hecho que no fué presentado a la corte, las autoridades están en conflicto, aunque ambos los juristas y las cortes han asegurado que ello sirve de base al remedio mediante el recurso de error *coram nobis*. Igual sucede cuando el acusado se hallaba loco al momento de su convicción, pudiendo encontrarse algunos casos que sostienen que éste puede tener éxito valiéndose de dicho recurso. Por otra parte, existe buena autoridad para la proposición de que no procede un recurso de error *coram nobis* basado en la demencia del acusado al momento en que se dictó sentencia en su contra, y que el remedio debe solicitarse en equidad."

Por supuesto que el auto no se expide sino cuando aparece con razonable certeza que un error substancial de hecho fué cometido. 46 Am. Dec. 260. Habiéndose decidido que la

discreción de la corte ejercitada para negarlo no es revisable en apelación. 34 Am. Dec. 395 y nota.

■ No es necesario que ahondemos en el estudio sobre la materia, porque en Puerto Rico la cuestión suscitada está regulada por el estatuto. Lo dicho es suficiente para satisfacer el interés histórico que levanta y para la debida interpretación de los procedimientos vigentes en armonía o con conocimiento de sus fuentes de origen.

Dice el artículo 439 del Código de Enjuiciamiento Criminal (ed. de 1935): ''Ninguna persona puede ser juzgada, sentenciada a pena, o penada por un delito público, mientras esté loca,'' precepto que consagra la conquista de la civilización en la materia.

Y luego la propia ley establece el procedimiento a seguir cuando surge la necesidad de aplicar el precepto. Es así:

''Artículo 440.—Si cuando se haya citado a juicio para decidir una causa, o en cualquier momento durante el juicio, o cuando se haga comparecer al acusado para oír la sentencia basada en la convicción de su culpabilidad, surge alguna duda sustancial respecto a la cordura del reo, el tribunal debe ordenar que esta cuestión se someta a la decisión de tres peritos que designará, y el juicio o el acto de pronunciar la sentencia debe suspenderse hasta que la cuestión quede resuelta por la decisión de dichos peritos. El jurado citado para el juicio puede ser exonerado de su obligación o quedar constituído, mientras esté pendiente de decisión el punto relativo a la locura, según lo que disponga discrecionalmente el tribunal.''

Seguidamente el código por sus artículos 441 a 444 regula la forma como deben actuar los peritos, el efecto de su declaración y lo que debe hacerse con el acusado si se le declara loco. *Iturrino* v. *Corte*, 50 D.P.R. 934.

■ Lo ocurrido en este caso concreto fué como sigue: El nuevo letrado defensor de la acusada alegó en su moción que por vez primera se enteró ''por su propia observación, y por el dictamen facultativo de psiquiatras reputados en la comunidad como autoridades en enfermedades de la mente, que la referida Leila Nazario estaba y se hallaba mentalmente

enferma.'' Alegó además que investigó con el anterior letrado Sr. Martínez Nadal con respecto a la conducta de la acusada y dicho letrado le manifestó que nunca pudo hacer comprender a su defendida la posición peligrosa en que se encontraba ni obtener de ella dato alguno para su defensa, mostrándose nerviosa en ciertas ocasiones, indiferente en otras, denunciando siempre un grado de inconsciencia que la imposibilitó de auxiliar a sus abogados en su beneficio. Expuso que Leila Nazario estuvo padeciendo de enajenación mental antes, desde el 29 de enero, 1935, al 3 de febrero siguiente, o sea, durante la celebración del juicio, y después. ·

Acompañó a su moción una certificación médica de los doctores Mario Fernández y M. Quevedo Báez, otra de la declaración del Dr. Fernández en el juicio, una declaración jurada del letrado Sr. Martínez Nadal, las instrucciones de la corte al jurado y las declaraciones juradas de María Dolores Rivera y del propio nuevo defensor sobre el estado de locura de la acusada.

En el acto de la vista de la moción el fiscal presentó en evidencia varias declaraciones que fueron admitidas sin objeción y copias de resultados de análisis.

La reacción de la conciencia del juez sentenciador ante las alegaciones, la evidencia anterior y nuevamente presentada y los informes de los abogados, consta de su resolución, así:

"Desde el acto de la lectura de acusación hasta después del veredicto estuvo la acusada representada por el letrado don Rafael Martínez Nadal. A pesar de la reconocida habilidad y competencia del letrado defensor en ningún momento se insinuó siquiera a la corte que la acusada mientras se celebraba el juicio se hallaba sufriendo de enajenación mental. La conducta de la acusada durante la celebración del juicio era perfectamente normal. Su principal defensa era la de hallarse padeciendo de enajenación mental en el momento de realizar el acto delictivo, estando de tal manera oscurecidas sus facultades que no podía distinguir entre el bien y el mal. Se presentó evidencia de ciertos actos realizados por la acusada en fecha anterior a la comisión del delito, se hizo por un médico una relación de las distintas enfermedades que desde su infan-

cia había padecido; declararon también su madre y los doctores Goenaga, Fernández, Lange y otros, y en ningún momento pudo observar la corte que la recordación de su infancia, ni la declaración de su madre, ni la relación de los distintos actos que como indicativos de locura se le imputaban, exaltasen en alguna forma a la acusada, ni produjesen en ella alguna impresión que no fuese la de una persona normal. Se abstuvo de declarar, como por regla general se abstienen los acusados de delitos de esta naturaleza, pero nunca se advirtió a la corte que la acusada no hacía uso de tal derecho por hallarse sufriendo de enajenación mental. Oyó estoicamente los informes del fiscal y la defensa, y más tarde el veredicto adverso del jurado, sin que revelase un estado mental anormal.''

Vuelve a referirse el juez a la moción cuyos hechos básicos había antes expuesto, y cita de 16 C. J. 1327, entre otros principios los que siguen: ''El auto de error *coram nobis* no procede para corregir una controversia de hecho (*issue of fact*) que ha sido adjudicada aunque erróneamente; . . . Tampoco puede utilizarse este recurso cuando los hechos de que se queja el acusado eran conocidos antes del juicio y pudieron alegarse en el mismo.'' Y continúa:

''En el presente caso la defensa de locura fué sometida al jurado. Se presentó una extensa evidencia tanto de hecho como pericial con el fin de probar que la acusada estaba loca en el momento de realizar los actos que se le imputan. El jurado oyó toda esa prueba así como la que en oposición a la misma presentó el fiscal, recibió instrucciones de la corte con respecto a la defensa establecida por la acusada, y después de deliberar por largas horas, considerando que la acusada era responsable de sus actos en el momento de realizar el delito que se le imputa, trajo un veredicto declarándola culpable de homicidio voluntario. De manera que los hechos que ahora se alegan como base del auto de error *coram nobis*, fueron presentados al jurado y hubo una adjudicación al rendirse el veredicto, lo que hace improcedente, como hemos demostrado, el auto de error *coram nobis*.

''Tampoco procede en este caso el nuevo juicio solicitado, porque en nuestra opinión el veredicto del jurado no es contrario a la ley y a la evidencia. Se alega que el veredicto del jurado es contrario a la ley y a la evidencia porque se sigue sosteniendo por la defensa que Leila Nazario estaba loca en el momento de realizar el delito.

"Desde el año 1843 en que Lord Chief Justice Tindall, en el caso de M'Naghten, evacuando la consulta que le hiciera la Cámara de los Lores, estableció el criterio a seguir para determinar la responsabilidad criminal en casos de locura, o sea que toda persona es responsable de sus actos a menos que al realizarlos no pueda distinguir entre el bien y el mal, desde esa fecha, repetimos, ha quedado establecido en la jurisprudencia tanto de Inglaterra como de los Estados Unidos, que no toda persona mentalmente enferma es irresponsable de sus actos. Aquél que ante el médico es un enfermo mental, como por ejemplo, los que padecen de impulsos irresistibles, de alucinaciones y manías extravagantes, no es un loco ante el Derecho si a pesar de su impulso irresistible, de sus alucinaciones y de sus manías, al realizar un acto se da cuenta que es contrario a la ley y por consiguiente que está haciendo mal. En este caso se presentó evidencia tendente a demostrar la conducta de la acusada en distintas ocasiones, tratando de probar así su irresponsabilidad al realizar el acto que se le imputa. Se presentó evidencia de que mientras se hallaba en estado grávido tenía la manía de masticar sal; que en cierta ocasión cogió un automóvil y corrió a gran velocidad por las carreteras de Santurce, sin hacer caso de las órdenes de la policía para que se detuviese, hasta que avisado de ello su esposo fué alcanzada por éste; que en otra ocasión al llegar un testigo a su casa observó que salía de la habitación rasgándose los vestidos, etc. En cambio, surgió de la prueba, de los testigos presenciales del suceso, una circunstancia que indudablemente sirvió de base al jurado para dirimir el conflicto de la evidencia en cuanto a la responsabilidad de la acusada, y fué la siguiente: de acuerdo con la prueba, cuando la interfecta Rafaela Pardo huía hacia el puesto de periódicos, corría tras ella la acusada con el revólver en la mano. Al penetrar en el puesto de periódicos, la interfecta se agarró a la dueña del establecimiento pidiendo protección. Mientras tanto, la acusada permanecía con el revólver en la mano y no fué hasta que la dueña del puesto logró desasirse de la interfecta que Leila Nazario hizo sus disparos contra ésta. Esta circunstancia revela claramente que la acusada se daba cuenta de que la que ella intentaba matar no era la dueña del puesto de periódicos, sino aquélla de quien tenía celos, contra la cual había un móvil, su rival Rafaela Pardo. Esta circunstancia por sí sola demuestra que en los momentos en que se realizó el delito la acusada tenía suficiente capacidad para distinguir entre el bien y el mal, pues de otro modo hubiera actuado como actúan los locos, disparando su revólver con-

tra cualquiera que se le pusiere delante, sea éste su más encarnizado enemigo o su ser más querido.

"Por estas razones, entendemos que el jurado interpretó correctamente la evidencia que se le presentó, y no alegándose en la petición, ni teniendo la corte conocimiento de que se haya cometido algún error de derecho durante el juicio ni en las instrucciones al jurado, ni ninguna otra irregularidad, no procede anular el veredicto.

"Con respecto a la alegación que ahora se hace que la acusada se hallaba loca en el momento del juicio, es suficiente lo que hemos dicho con respecto a la conducta de la acusada durante el juicio.

"Se ha dicho por la Corte Suprema de California en el caso de *People* v. *Gilberg*, 197 Cal. 306, resuelto en octubre de 1925, que nadie está en mejores condiciones que el juez que preside el juicio, para apreciar la conducta del acusado durante el mismo, y que por esta razón se le concede una amplia discreción al determinar si el acusado debe o no ser sometido a un juicio de peritos.

"Declararon como peritos los alienistas doctores Mario Fernández y F. R. de Goenaga, quienes a pesar de haber estado en contacto con la acusada mientras se celebraba el juicio, ninguno manifestó que la acusada estuviese loca en aquella ocasión. En la declaración del Dr. Mario Fernández, a pesar de ser extensa, en ningún momento se indica que la acusada se encontraba sufriendo de enajenación mental en los momentos en que él declaraba. Se contrae exclusivamente al estado mental de la acusada en la fecha de la comisión del delito. Lo mismo sucede con la declaración del Dr. Goenaga.

"El Dr. Pereira Leal, en cuya clínica estuvo recluída la acusada y sufrió una operación quirúrgica varios meses después de la fecha en que se cometió el delito, declaró que nada anormal observó en el estado mental de la acusada mientras estuvo en su clínica, y que de haberlo observado, la hubiera referido a un alienista, porque según declaró él 'no opera a locos.'

"Más de una ocasión hubo para que cualquiera de estos médicos que por espacio de varios días, mientras se sustanciaba el juicio, estuvieron en contacto con la acusada, hubiesen hecho alguna alusión siquiera a su estado mental en aquellos días.

"La declaración del Lic. Martínez Nadal sobre la actitud de la acusada durante el juicio, conociendo como conocemos su reconocida competencia como criminalista, sólo nos la explicamos al considerar su justo deseo de no aparecer obstaculizando al compañero que le ha sustituído en la representación de la acusada.

"Refiriéndonos ahora a la última etapa de la moción, o sea, la alegación de que la acusada sufre actualmente de enajenación mental, resolvemos que no procede la concesión de un nuevo juicio, ni someter el caso a un jurado de peritos médicos, porque la corte no tiene duda sustancial con respecto a la capacidad mental actual de la acusada. La evidencia que ahora se presenta para demostrar que la acusada se halla actualmente loca, es la misma que oyó y resolvió el jurado al dictar su veredicto de culpabilidad en este caso. La única evidencia nueva que se presenta es una certificación del Dr. Quevedo Báez, en que basa sus conclusiones en la misma evidencia que se presentó al jurado sobre los actos realizados por la acusada antes y después de la realización por la acusada del delito, y la circunstancia de hallarse la acusada actualmente recluída en el manicomio.

"  .      .      .      .      .      .      .      .      .      .

"Resulta en verdad extraño que hallándose la acusada loca en el momento de realizar el delito y durante varios días que duró el juicio, no se le haya ocurrido a los familiares de ésta recluirla en el manicomio hasta muchos días después de haber jugado y perdido su última carta en la contienda judicial que terminó con el veredicto adverso el 2 de febrero último. Si realmente la acusada estaba loca, ¿por qué no se le recluyó inmediatamente en el manicomio, de este modo impidiendo que sufriera el vía crucis de un juicio por asesinato con todas sus consecuencias?

"Pero hay algo más que no debemos pasar por alto al resolver esta última cuestión. Durante la vista de la moción se presentó en evidencia por el fiscal una declaración jurada del Dr. Luis M. Morales, especialista en enfermedades mentales y nerviosas, en la que hace constar que el 26 de febrero último practicó una punción lumbar en el cuerpo de Leila Nazario, sustrayendo líquido céfalo-raquídeo, que el declarante marcó 'Leila Nazario, Manicomio Insular' y lo remitió al Laboratorio Biológico del Departamento de Sanidad. También presentó el fiscal en dicha ocasión la declaración de Carlos Bou, quien ocupa el cargo de Serólogo Auxiliar (Técnico Serológico) en el Laboratorio Biológico desde el año 1929, que fué enviado por la Fundación Rockefeller a Estados Unidos donde por espacio de seis meses cursó estudios especiales en técnica serológica como la de Wassermann y Kahn, y también en líquido céfalo-raquídeo, y en reacciones de oro coloidal, declarando dicho testigo que el 28 de febrero de 1935 practicó una reacción de Wassermann y de Kahn en una sangre rotulada 'Leila Nazario,' enviada desde el Manicomio Insular,

y que el mismo día 28 de febrero de 1935 practicó también una reacción de Wassermann y una reacción de oro coloidal en un líquido rotulado 'Leila Nazario.' Que al leer los resultados de esas técnicas y ver el nombre de Leila Nazario en un caso que había estado sub júdice en las cortes de Puerto Rico, llevó para que el director del laboratorio, Dr. Oscar Costa Mandry, viese personalmente el resultado de dichos exámenes, siendo negativos tanto el resultado de la reacción de Wassermann como la de la reacción de Kahn. Que el resultado del líquido fué negativo lo mismo en la reacción de Wassermann que en la reacción Lange.''

Transcribe entonces la declaración del Dr. Costa Mandry presentada por el fiscal en el acto de la vista de la moción sobre el resultado negativo de sífilis en los exámenes de sangre y líquido céfalo-raquídeo de Leila Nazario y termina como sigue:

''De modo que cuando se está asegurando que la acusada está actualmente loca y que la causa de su enfermedad es heredo-sífilis, el laboratorio no encuentra evidencia alguna de lo que se alega ser la causa de tal locura.

''Además, la certificación que sirvió para recluir a la acusada en el Manicomio Insular, está basada en conclusiones e inferencias sobre el historial clínico de la acusada, historial que fué oído y considerado por el jurado al traer el veredicto. *People* v. *Sloper,* 198 Cal. 238.

''No compartimos la opinión de la defensa de que por el solo hecho de que la acusada ofreciera y la corte admitiera evidencia con el fin de determinar si aquélla estaba loca o no en el momento de realizar el delito, y por el hecho de haberse dado instrucciones al jurado sobre la defensa de locura, está la corte obligada a tener duda sustancial con respecto a la enajenación de la acusada y concederle un nuevo juicio o someterla a un jurado de peritos. En ningún caso puede la corte impedir que el acusado ofrezca prueba de locura en el momento de realizar el delito, siempre que esta prueba se ofrezca de acuerdo con los preceptos de la Ley de Evidencia, y una vez presentada la evidencia, la corte está obligada a instruir al jurado sobre la ley en relación con la defensa de locura. Todo lo contrario de lo sostenido por la defensa parece indicar la Corte Suprema de California en la cita que hacemos del caso de *People* v. *Sloper,* supra.''

Hemos analizado la evidencia practicada y tomado en consideración todo cuanto dice el defensor de la acusada en su alegato, y opinamos que la resolución de la corte revela un estudio detenido y hondo de la cuestión que se le presentara y un ajuste completo a la ley y a la jurisprudencia al decidirla.

La corte no estaba obligada por el solo hecho de la presentación de la moción jurada acompañada de *affidavits,* a declararla con lugar. Cumplió su deber abriendo el asunto a discusión y a prueba. Estaba facultada para resolverlo de acuerdo con los hechos y la ley, en el ejercicio de su discreción. Ya hemos visto que se ha llegado tan lejos como a decidir que no cabe revisar esa discreción en grado de apelación. Tendría que demostrarse que se había abusado de ella para que el tribunal superior estuviera justificado en una revocación. Y aquí, aparte de que en realidad se trata de una cuestión de hecho que no sólo surgía de los autos cuando la moción fué presentada, si que fué resuelta en contrario por el jurado en cuanto a la locura en el acto de la comisión del delito y pudo ser suscitada durante el juicio en cuanto a la locura mientras el mismo se celebraba, aparte de eso, repetimos, lo que revelan los autos no es un mal uso sino un buen uso de la discreción judicial al resolver la cuestión de hecho suscitada, considerada de nuevo, como si no surgiera de los autos con anterioridad a la moción.

Enfermos son en verdad esos pobres seres que como Leila Nazario cometen delitos pasionales, pero no dementes irresponsables, incapaces de distinguir el bien del mal. Si de algo pecó la corte sentenciadora en este caso fué de benigna al imponer la pena.

*Los recursos serán declarados sin lugar y confirmadas la resolución y las sentencias apeladas.*