El Pueblo de Puerto Rico, demandante y apelado, *v.* Dimas Ortiz Morales, acusado y apelante. El Mismo v. El Mismo.

Núms. 8607 y 8608.—*Sometidos:* Junio 18, 1941. *Resueltos:* Junio 27, 1941.

*Carlos García Méndez,* abogado del apelante; *Hon. Procurador General George A. Malcolm* y *R. A. Gómez, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

Contra Dimas Ortiz Morales se formularon ante la Corte Municipal de San Germán dos denuncias separadas, una por delito de acometimiento grave y la otra por portación ilegal del revólver usado en la comisión del acometimiento. En la primera se le imputa haber acometido a Fernando Mercado, con un revólver, haciéndole dos disparos sin lograr herirlo. Convicto de ambos delitos y no conforme con las sentencias de $50 de multa por el acometimiento y un mes de cárcel por la portación de armas, el acusado interpuso estos dos recursos, los que resolveremos con una sola opinión.

Se basan ambos recursos en un solo señalamiento, en el que se alega que la corte inferior cometió manifiesto error de hecho y de derecho al condenar al acusado sin prueba suficiente para sostener las alegaciones de las denuncias y sin tomar en consideración la prueba de la defensa.

Haremos un resumen de la evidencia de ambas partes.

Fernando Mercado, declaró que el día de autos venía de Lajas para San Germán guiando un automóvil; que al llegar al kilómetro 4, hectómetro 4, de la carretera que une a ambos pueblos tuvo un accidente, arrollando a un señor llamado Luis Ortiz Ramírez, padre del acusado, quien murió después; que al bajarse del automóvil para recoger al herido, llegó el acusado y le hizo un disparo con un revólver niquelado, pero no sabe si el revólver era grande o pequeño;

que el acusado bajó de una loma, de una casita en la carretera, llegó y le tiró el primer tiro y no lo cogió; que el tiro se lo disparó en la carretera cuando estaba él solo recogiendo al herido. Repreguntado por la defensa, dijo: que cuando él vió al acusado ya éste estaba en la carretera y venía andando; que cuando el acusado le hizo el primer disparo él dió la vuelta por la carretera y entonces el acusado corrió y él corrió también; que después que le ocultaron el revólver, el acusado lo llamó y entre los dos recogieron al padre, se montaron en el carro y fueron al pueblo con el herido, llevándole al hospital, donde falleció.

María Collado, a preguntas del fiscal, declaró: que ella venía en el automóvil que guiaba Fernando Mercado, en viaje hacia San Germán, y vió cuando el carro mató a un señor que cruzaba la carretera; que vió cuando Dimas Ortiz le hizo dos disparos a Mercado, con una pistola niquelada; que ella oyó dos disparos. Repreguntada por la defensa, dijo: que cuando el primer disparo ella se quedó en el automóvil, pero cuando hicieron el segundo se fué; que no sabe si el arma era revólver o pistola, ni sabe de qué calibre era.

El fiscal y la defensa estipularon que los demás testigos del fiscal si declarasen, lo harían en la misma forma en que lo hizo la testigo María Collado. Y así terminó la prueba del fiscal, no presentándose el arma por no haber sido ocupada.

Denegada la moción para la absolución perentoria del acusado, basada en que el arma no había sido identificada mediante prueba clara y convincente, la defensa expuso como su teoría la de "que el acusado no tuvo conciencia de los actos que estaba cometiendo." Y para sostenerla ofreció la siguiente prueba testifical:

Luis Camacho Rivera, escribiente de la Colecturía de Rentas Internas de Lajas, declaró: que el día de autos, al pasar por el sitio del suceso, vió cuando el automóvil arrolló

al padre del acusado y lo tiró a la cuneta; que cuando iban a ver en qué estado se encontraba el herido, notó que de la casa del frente, donde vivía, bajaba el acusado, pero notó que bajaba *en un estado inconsciente;* que el acusado no bajaba en un estado violento, sino *en un estado inconsciente,* y que en ese momento ellos le decían: "Dimas, espérate un momento; vamos a ver lo que le pasa a tu papá"; que su actitud en ese momento era la de un loco, completamente inconsciente; que ellos lo cogieron y lo dominaron, y como que despertó de un sueño y decía: "¿Cuál fué el chófer, cuál fué el chófer?"; que le dijeron quién era el chófer y entonces se montó con él en el carro para ir al hospital; que el acusado tenía un revólver en las manos e hizo dos disparos al aire, completamente inconsciente; que cuando le dijeron que el padre estaba vivo le entró la calma; que cuando el acusado venía de la casa, que está como a 30 metros, venía con el revólver. Repreguntado por el fiscal, sostuvo que los dos disparos que hizo el acusado fueron hechos al aire, hacia arriba, antes de llegar a la carretera y dentro de la finca; que cuando le llamaron la atención el cusado reaccionó y que su actitud fué buena después que le dijeron que su papá podía recuperar.

Declaró el acusado en su propia defensa: que él estaba esperando a su papá para que se desayunara como de costumbre; que vió cuando el automóvil que venía subiendo la carretera le dió a su padre y lo echó a la cuneta; que después de eso no vió más nada, ni supo de más nada; que se vino a dar cuenta de lo ocurrido cuando al pasar a la orilla de la carretera los amigos le decían: "Tu papá está vivo todavía y puede curarse"; que entonces él preguntó: "¿Cuál es el chófer?", y le dijeron que era Fernando Mercado, y entonces él le dijo a Mercado "vente, vamos a llevarlo al hospital," y se fueron juntos y solos los dos. Repreguntado por el fiscal, dijo que después de todo lo ocurrido, él habló con el chófer y no peleó con él; que sabe que le disparó tiros al chófer y que lo vió, pero que no recuerda nada más; que

cuando estaba en el balcón de la casa no tenía el revólver encima; que no sabe cómo ni cuándo se armó del revólver, ni si hizo uso del revólver contra el chófer.

El Dr. Nelson Perea, declarando como perito psiquiatra, informó extensamente sobre lo que se llama "caos momentáneo" o "ataque súbito de locura," y dijo:

"Esa locura que comunmente podemos llamarle caos momentaneo o ataque súbito de locura, esa locura viene casi siempre seguida de una impresión o *shock;* una impresión que produce estimulación de las glándulas suprarrenales; éstas producen una secreción que se extiende por la sangre rápidamente produciendo una contracción de los vasos sanguíneos por todo el cuerpo, especialmente en el cerebro causando una anemia cerebral momentánea que pudiera producir un estado de semiinconsciencia que puede durar varios minutos. Estos síntomas se manifiestan en el individuo produciendo una presión alta en la sangre, palidez, excitación y falta momentánea de razón o locura momentánea. En ese momento de locura momentánea el individuo se muestra en estado semiinconsciente."

.   .   .   .   .   .   .   .   .   .

"P. ¿Encontrándose el acusado desarmado, el acto de entrar dentro de la casa, el acto de irse a armar de un revólver y llegar al radio que lo separa de esa distancia y hacer varios disparos, es inconscientemente que se hace del revólver y hace los disparos?

"R. Sí, señor, lo mismo que puede coger el revólver, ha podido coger un cuchillo u otra cosa. Inmediatamente que ve el acto le produce una secreción suprarrenal. Esa secreción es inmediata y pierde la razón y en ese instante puede armarse de un revólver o ejecutar distintos actos, pero esos actos los ejecuta bajo un estado anormal, un estado semiinconsciente.

"P. ¿Inmediatamente produce la inconsciencia?

"R. Inmediatamente sufre una inconsciencia por efecto de la secreción suprarrenal."

La prueba que hemos examinado es clara y convincente y a nuestro juicio suficiente para sostener las dos sentencias recurridas. Tanto la prueba del fiscal como la de la defensa, establecen fuera de toda duda el hecho esencial de que el acusado, en la carretera pública, hizo dos disparos de revólver contra el chófer que guiaba el carro que arrolló a su padre.

Sin ser peritos psiquiatras sabemos que es lógico y natural que un ser humano normalmente constituído sienta un impulso y un deseo irresistibles de castigar y hasta de privar de la vida a la persona que ha causado un daño o la muerte a un ser querido. Somos humanos y frágiles y nos damos cuenta de que en circunstancias idénticas a las del caso de autos podríamos también convertirnos en víctimas de nuestras propias pasiones e impulsos.

La ley no reconoce a ningún ciudadano el derecho a hacerse justicia por sí mismo. El impulso irresistible que lleva a una persona a cometer un acto de violencia contra quien ofendió o causó la muerte a un ser querido, puede y tal vez debe ser considerado por el juzgador como un atenuante, pero nunca como una circunstancia eximente del delito. Véanse: *El Pueblo* v. *Echeandía,* 23 D.P.R. 561, 563; *El Pueblo* v. *Nazario,* 53 D.P.R. 239, 244; *People* v. *Hoin,* 62 Cal. 120.

Las penas mínimas impuestas en uno y otro caso indican claramente que la corte sentenciadora consideró que las circunstancias bajo las cuales había actuado el acusàdo atenuaban su falta.

*Deben confirmarse ambas sentencias.*