Josέ Córcoles Droz, peticionario y apelante, *v.* Gerardo Delgado, etc., demandado y apelado.

*Número:* AP-62-64      *Resuelto:* 23 de septiembre de 1963

*José Otero Suro*, abogado designado por el Tribunal Supremo para representar al acusado en apelación; *José Córcoles Droz*, por sí; *J. B. Fernández Badillo, Procurador General*, e *Irene Curbelo, Procurador General Auxiliar*, abogados del apelado.

Sala integrada por el Juez Asociado Señor Belaval como Presi-
dente de Sala y los Jueces Asociados Señores Hernández
Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del
Tribunal.

Se trata de una apelación interpuesta contra un fallo de
la Sala sentenciadora de 4 de junio de 1962 que declaró sin
lugar un recurso de hábeas corpus. El peticionario-apelante
sometió un alegato por su propio derecho en apoyo del recurso
en 19 de diciembre de 1962. El Procurador General radicó el
suyo en enero 18, 1963. En 30 de enero el peticionario soli-
citó que se elevaran ciertos récords de la Cárcel de Distrito de
San Juan, donde estuvo confinado pendiente el juicio, para
acreditar que siempre permaneció allí sin que se le llevara
al examen médico ordenado por el Tribunal, y el 23 de abril
de 1963 este Tribunal tuvo a bien designar al Lcdo. José
Otero Suro para que representara al apelante en este proce-
dimiento y le ofreciera asistencia legal, concediéndosele un
término de 30 días para que presentara el alegato correspon-
diente. Dicho alegato fue sometido y en él se pide la revoca-
ción de la sentencia. El Procurador General sometió final-
mente el caso por su Informe anterior.

Este recurso presenta la siguiente situación. En 19 de
febrero de 1952 se presentaron dos acusaciones contra el pe-
ticionario José Córcoles Droz por hurto mayor, cometidos
alegadamente el 17 de diciembre de 1951 y el 9 de enero de
1952. Se efectuó la lectura de la acusación en 20 de febrero
de 1952 ante el Hon. Pelayo Román Benítez. Surge de la
minuta que este acusado era una persona ambulante, desem-
pleada. El acusado solicitó que se le sometiera a un examen de
sus facultades mentales a lo cual el Fiscal no hizo objeción
alguna y el Hon. Román Benítez dictó por escrito en esa fecha,
20 de febrero de 1952, una orden para que el acusado se ingre-
sara en el Hospital de Siquiatría de Río Piedras y fuera allí
examinado por un grupo de siquiatras quienes determinarían

sobre el estado mental de dicho "paciente". Procedió a designar a los Dres. Ramón Fernández Marina, Director del Hospital de Siquiatría, Ramón Señeriz y R. Troyano de los Ríos para que se trasladaran al Hospital de Siquiatría tan pronto fueran informados que dicho "paciente" se encontraba allí recluido y practicaran un estudio del "paciente" y rindieran al Tribunal un informe sobre el resultado de su investigación. Ordenó que todos los procedimientos del caso quedaran suspendidos hasta tanto se recibiera dicho informe y ordenó al Alcaide de la Cárcel de Distrito que procediera a trasladar a ese "paciente" al Hospital de Siquiatría para que allí fuera sometido al examen ordenado por el Tribunal. Al siguiente día, 21 de febrero de 1952, se envió copia de la referida orden al Dr. Ramón Fernández Marina, Director del Hospital de Siquiatría, para que a la mayor brevedad posible informara al Alcaide de la Cárcel la fecha en que debía mandar al acusado a esa institución.

En 7 de noviembre de 1952 el acusado, por su propio derecho, radicó una moción de sobreseimiento y archivo alegando haber estado preso en la cárcel durante 9 meses sin que se le hubiera celebrado juicio. La vista de esta moción se señaló para el 18 de noviembre de 1952. La moción de archivo fue declarada sin lugar en esa fecha por el Tribunal, presidido por el Hon. Julio Suárez Garriga, pero ordenó (1) que los procedimientos siguieran suspendidos conforme a la orden de 20 de febrero de 1952 del Juez Román Benítez; (2) que por el Secretario se solicitara del Director del Hospital de Siquiatría información sobre (a) la fecha en que el acusado ingresó en dicha institución; (b) los exámenes y tratamientos a que fue sometido; (c) conclusión a la que llegó la facultad respecto a la salud mental del acusado y (d) fecha en que fuera devuelto a la Cárcel de Distrito de San Juan, y (3) que el acusado fuera traído el 28 de noviembre de 1952 ante el Tribunal, así como el informe del Hospital de Siquiatría. El mismo día 18 de noviembre de 1952 el Secretario del Tribunal

dirigió una comunicación al Director del Hospital de Siquiatría conforme lo dispuesto por el Juez Suárez Garriga, requiriéndole que el informe debía estar en el Tribunal para el 28 de noviembre. Los procedimientos del 28 de noviembre de 1952 fueron suspendidos por enfermedad del abogado de oficio del acusado. Hay en el expediente citaciones expedidas para una vista del caso el 9 de febrero de 1953 habiéndose citado al Director del Hospital de Siquiatría para esa fecha.

En 9 de febrero de 1953, según la minuta, el acusado compareció ante el Hon. Jesús A. González asistido de su abogado de oficio. Renunció al jurado, hizo alegación de culpabilidad y en esa misma fecha fue sentenciado a cumplir una pena de 5 a 10 años de presidio en cada una de las acusaciones.

El 6 de febrero de 1962 el peticionario, asistido por el Lcdo. Víctor Velasco Gordils de la Sociedad para Asistencia Legal, radicó una petición de hábeas corpus ante la Sala sentenciadora. Alegó bajo juramento que se le enjuició y sentenció sin jurisdicción por cuanto los siquiatras nombrados por el Tribunal nunca lo examinaron ni tampoco declararon en el juicio en cuanto a su condición mental. En la vista del recurso el peticionario presentó prueba demostrativa de que en su expediente médico de la Penitenciaría no aparecía que se le hubiera hecho un examen en cuanto a su condición mental para la fecha del juicio, si bien tal examen podía o no aparecer en dicho expediente. Tampoco se le hizo examen mental al ser ingresado. En 1962 las autoridades del Presidio creyeron necesario someterlo a examen siquiátrico por una serie de actos que demostraban que la persona no estaba bien. Este examen no demostró sicosis.

Se trajo al récord durante la vista el contenido de un informe fechado el 1ro. de mayo de 1950 obrante en el expediente del penal del peticionario, al efecto de que había estado recluido en el Dannemora State Hospital desde 1931 a 1938 y desde 1941 a 1949 bajo un diagnóstico de sicosis con deficiencia mental con episodios de excitación y un paranoico.

Otro examen sicológico de 18 de abril de 1950 demostraba una edad mental de 9 años cinco meses y un cociente de inteligencia de 63. (1)

El peticionario solicitó que se citaran los médicos designados para examinarle. La Sala ordenó la citación de uno de ellos, Dr. Ramón Señeriz para que compareciera en una próxima audiencia, trayendo cualquier evidencia en su poder acreditativa de que se le hubiera hecho o no un examen al peticionario. En la próxima vista, el Dr. Señeriz no compareció. (2)

Después de aludirse de nuevo al contenido de los informes mencionados sobre la condición mental del peticionario desde el 1931, lo cual el Ministerio Público aceptó como un hecho establecido, el récord demuestra:

"HON. JUEZ PALMER:

No aparecen en autos los expedientes. Aquí se dicta orden para que se una a este caso el expediente del caso criminal G-52-97 y G-52-87. Que se unan a los autos de este caso. Entonces, el Tribunal, con esto, a menos que tengan alguna otra sugestión, entendería por sometido el caso.

"LIC. VELASCO:

Entendemos que si ésa es la prueba que el Tribunal cree necesaria al caso, con ésa lo someteríamos." (3)

Resolviendo el recurso, en 4 de junio de 1962 la Sala sentenciadora dictó el siguiente fallo:

"DETERMINACIONES DE HECHOS—El peticionario cumple prisión bajo la custodia del demandado y en virtud de sentencia del 9 de febrero de 1962, [*] donde en el caso G-52-97 de este tribunal se le impuso una pena de cinco a diez años de presidio por

---

(1) El peticionario tenía 47 años de edad al ser procesado.

(2) No se sabe si se le citó o no.

(3) Aparentemente el abogado del peticionario entendió que el Juez consideraba suficiente la prueba practicada y quizás por ello no insistió en la comparecencia y declaración del Dr. Señeriz.

[*] 1953.

el delito de hurto mayor. También cumple sentencia por el mismo delito y por el mismo término según sentencia dictada en el caso, G52-87 de este tribunal en la misma fecha. En ambos casos se declaró culpable.

"En una ocasión durante la tramitación del caso G52-87 el tribunal ordenó un examen mental del peticionario para determinar si estaba en condición mental que permitiera el proceso en su contra. No existe indicio en cuanto a si se efectuó el referido examen y en cuanto al resultado del mismo. La orden sobre examen mental aconteció el 20 de febrero de 1952, y las sentencias mencionadas ocurrieron, un año más tarde, el 9 de febrero de 1953 y como se dijo mediante declaración de culpabilidad que no se impugnó nunca. CONCLUSIONES DE DERECHO—Bajo las circunstancias expresadas no existe base legal para anular las referidas sentencias que cumple hoy el peticionario y debe por lo tanto declararse sin lugar el presente recurso.

"No existe evidencia alguna indicadora de que el acusado estuviera loco cuando hizo las declaraciones de culpabilidad que dieron lugar las sentencias mencionadas ni que el tribunal hubiere actuado sin facultad condenando a una persona que estaba en ese momento, loca. SENTENCIA—Se declara sin lugar el recurso y se anula el mismo. Regístrese y notifíquese. San Juan, Puerto Rico, a 4 de junio de 1962."

Surge del expediente G52-97 que en 23 de enero de 1962 el peticionario solicitó la transcripción de evidencia de los procedimientos habidos en la vista de las causas criminales, en relación con un recurso de hábeas corpus, CS59-7513, el cual según expuso fue declarado no ha lugar. Esta moción sobre transcripción de evidencia le fue denegada al peticionario en 12 de abril de 1962.

En su informe el Procurador General nos dice:

"El récord existente contiene grandes lagunas. No sabemos qué ocurrió después del 18 de noviembre de 1952 fecha de la segunda orden del Tribunal sentenciador exigiendo la presentación del informe de los peritos siquiatras. No sabemos si se efectuó examen o de haberse efectuado si el informe fue sometido al Tribunal. No sabemos qué ocurrió en la vista del 15 de diciembre de 1952 que motivara el señalamiento del juicio para el día 9 de febrero de 1953.

"Estas lagunas no se llenaron con la prueba desfilada en la vista del recurso de Hábeas Corpus. En dicha vista el apelante solicitó que se unieran al expediente los autos de los casos G52-87 y G52-97 cuyo contenido ya conocemos. Con la declaración de la Sra. Ceferina Cedeño, Psicóloga de la Penitenciaría Estatal, el peticionario-apelante sólo logró establecer que un informe siquiátrico solicitado por un tribunal con anterioridad a la fecha en que el sentenciado ingresa en la penitenciaría no aparecería de los archivos a su cargo a menos que el director de la institución lo pidiera y que el expediente médico del peticionario-apelante sólo revelaba que fue sometido a un examen siquiátrico en el 1962. En la vista celebrada el día 15 de mayo de 1962 el abogado defensor solicitó, y así lo ordenó el Tribunal, que se citara a uno de los peritos médicos, Dr. Ramón Señeriz, para probar con su testimonio que el informe médico nunca fue sometido al Tribunal sentenciador. Dicho testigo no compareció el día 24 de mayo de 1962, fecha señalada para la continuación de la vista, y la representación legal del peticionario-apelante no hizo ulteriores esfuerzos para conseguir la comparecencia del Sr. Señeriz. Por último el peticionario no se sentó a declarar a pesar de que se anunció que así lo haría con el propósito de esclarecer lo ocurrido en el juicio del día 9 de febrero de 1953.

"De la prueba que tuvo ante sí el Tribunal Superior surgen dos supuestos igualmente factibles: (1) que los médicos rindieron su informe declarando al acusado cuerdo y por esa razón se procedió con el juicio; 2) o que los médicos no rindieron su informe pero al observar el comportamiento del acusado el día 15 de diciembre de 1952, el tribunal no tuvo duda sustancial sobre la capacidad del acusado para entrar a juicio y señaló el mismo para el día 9 de febrero de 1953. Es posible que los médicos hallaron al acusado loco y a pesar de ello el Tribunal lo sometiera a juicio pero esto es sumamente improbable y además no se alegó siquiera."

No obstante lo anteriormente expuesto, concluye el Procurador General:

"En cualquiera de los dos casos el Tribunal sentenciador actuó correctamente: en el primero, porque la Ley expresamente dispone que si el dictamen de los peritos es al efecto de que el acusado está cuerdo el Tribunal procederá a señalar el juicio y en el segundo, porque el tribunal tenía facultad para ejercer su

discreción nuevamente a la luz de acontecimientos posteriores. El Tribunal sentenciador pudo tener duda sustancial en cuanto a la cordura del reo para el 20 de febrero de 1952 y no tenerla para el 15 de diciembre de 1952. Habían transcurrido 10 meses, tiempo durante el cual el acusado pudo recobrar la razón, si es que alguna vez le faltó, de manera que para el 15 de diciembre de 1952 estuviese en condiciones de comprender los procesos que se seguían en su contra y de conducir su defensa en forma racional."

Más adelante, refiriéndose a la prueba sobre la condición mental del peticionario desde 1931, comenta:

"Esta prueba a lo sumo demuestra que para la fecha de la lectura de la acusación, o sea, para el 20 de febrero de 1952 el Tribunal pudo tener duda sustancial sobre la cordura del acusado y por esa razón ordenó que fuera sometido a examen siquiátrico. Nada demuestra esta prueba sobre el estado mental del acusado para el 15 de diciembre de 1952 cuando se fijó la fecha para el juicio. A pesar de que tenía el peso de la prueba en esta cuestión el peticionario-apelante no presentó prueba alguna para fundamentar su alegación al efecto de que los peritos médicos jamás rindieron un dictamen. Suponiendo que no hubo dictamen médico, el Tribunal pudo reevaluar la situación diez meses después y decidir que el acusado estaba mentalmente capacitado para entrar a juicio.

"No se cometieron los errores señalados."

En las circunstancias del récord no podemos convenir con el fallo de la Sala sentenciadora, y se nos hace difícil concurrir en la disposición final que de toda la situación ofrece el Gobierno. La encuesta sobre la legalidad de la prisión del peticionario que por vía de hábeas corpus se abrió en este caso no fue resuelta por el fallo. Después del fallo el problema planteado quedó en la misma situación en que se encontraba al expedirse el auto y comenzarse los procedimientos. Este Tribunal no puede sancionar la sentencia apelada a base de la existencia de distintos supuestos igualmente factibles: que el acusado fue declarado cuerdo por los médicos y por esa razón se le enjuició; o que los médicos no rindieron informe pero el Tribunal, no obstante, por su propia observación enjuició

al peticionario; o que los médicos hallaron al peticionario loco y a pesar de ello el Tribunal lo sometiera a juicio, sin que la Sala sentenciadora en el procedimiento de hábeas corpus determinara cuál de esos supuestos tuvo lugar, lo que constituye la cuestión litigiosa. Menos aún podríamos sancionar el fallo considerando que se trata de hechos que eran parte de procedimientos judiciales de una corte de récord como lo es el Tribunal Superior.

Enfocando el problema ahora desde el punto de vista del derecho aplicable, el Art. 439 del Código de Enjuiciamiento Criminal—ed. 1935—dispone que ninguna persona puede ser juzgada, sentenciada a una pena, o penada por un delito público mientras esté loca. El 440 que le sigue estatuye que si surge alguna duda sustancial respecto a la cordura del reo, el Tribunal *debe ordenar* que esta cuestión se someta a la *decisión* de tres peritos que designará, y el juicio o el acto de pronunciar sentencia "debe suspenderse *hasta que la cuestión quede resuelta por la decisión de dichos peritos.*" El Art. 441 detalla el procedimiento a seguirse para resolver "la cuestión de la locura", y el 442 ordena que "si los peritos declaran cuerdo al acusado" debe continuar el juicio o ser pronunciada la sentencia. Si lo declaran loco debe suspenderse el juicio o la sentencia hasta que recobre la razón. ([4])

Se aduce, y ese criterio pareció influir mucho en la Sala sentenciadora a juzgar por sus expresiones en el curso de la vista, que se trata de una cuestión discrecional para el Tribunal el someter o no a un acusado a examen siquiátrico como condición a enjuiciarlo. Este Tribunal ha dicho que en un principio ello es producto del ejercicio de una sana discreción, ya que el estatuto hace mandatorio dicho examen—Art. 440—si surge alguna duda sustancial en el juzgador respecto a la cordura del reo. En *Pueblo* v. *Nazario*, 53 D.P.R. 239 (1938), sostuvimos a este respecto que por el solo hecho de

---

([4]) La situación a partir del 30 de julio de 1963 se gobierna por la Regla 240 de Procedimiento Criminal.

presentarse una moción con declaraciones juradas pidiendo que se investigara el estado mental de la acusada, el Tribunal no estaba obligado a declararla con lugar, y pudo abrir el asunto a discusión y prueba y resolverlo de acuerdo con la ley en el ejercicio de su discreción. Y véase: *Pueblo v. Villarrubia*, 54 D.P.R. 346 (1939) y *Pueblo v. Báez*, 67 D.P.R. 301 (1947), donde dijimos que una moción a tenor del Art. 440 del Código de Enjuiciamiento Criminal va dirigida a la discreción de la corte, no debe intervenirse con su resolución a menos que hubiere un abuso de dicha discreción, y que los procedimientos para someter al acusado al examen siquiátrico son necesarios sólo cuando hay en la mente del juez sentenciador alguna duda sustancial en cuanto a la cordura del acusado.

■ Pero también hemos resuelto, *Pueblo v. Corte*, 63 D.P.R. 382 (1944), que sometida a examen la condición mental del acusado, la disposición del asunto sólo puede ser resuelta por la decisión de los peritos médicos. Véanse: *Iturrino v. Corte*, 50 D.P.R. 934 (1937) y *Pueblo v. Nazario*, ante. Cf. *Pueblo v. Cruz Román*, 84 D.P.R. 451 (1962). En *Pueblo v. Corte*, que comentamos, los peritos declararon que el acusado no estaba loco. La situación parecía una un tanto difícil de determinar y ellos mismos sugirieron que el acusado fuera enviado al Manicomio para estudio de la condición mental. A tenor de ese criterio el Tribunal suspendió los procedimientos y ordenó que el acusado fuera enviado al Hospital de Siquiatría. Esa determinación no fue sostenida por nosotros. Habiendo dictaminado los médicos que el acusado estaba cuerdo, dijimos (pág. 384) : "En su consecuencia, la corte inferior no tenía autoridad para actuar bajo tales circunstancias de conformidad con el Art. 442. Es claro que el Código *no deja lugar para el criterio independiente de la corte de distrito* sobre la materia; la corte viene obligada por el dictamen de los peritos sobre esta cuestión. . . . Pero en ausencia de un dictamen específico de los peritos de que el acusado estaba loco, no había base bajo el Art. 442 para dictar

la orden de la corte de distrito recluyendo al acusado en el manicomio." (Énfasis puesto.)

■ Igual razonamiento se aplica a la situación inversa del caso ahora ante nos. En ausencia de un dictamen de que el acusado estaba cuerdo, el tribunal carecía de facultad para someterlo a juicio a base de cualquier criterio independiente que pudo tener a la fecha en que el peticionario fue enjuiciado, sin que se siguiera el procedimiento del Art. 441. No es este procedimiento de hábeas corpus el lugar para formar juicio en cuanto a si en 20 febrero de 1952 el tribunal estuvo justificado o no o si hizo o no un buen uso de su discreción al ordenar la suspensión de los procedimientos y someter la cuestión de la locura del acusado a los peritos médicos. A la luz de los antecedentes que habían, la reclusión del peticionario durante 15 años como un enfermo mental y el diagnóstico habido, diríamos que el tribunal en ese entonces pudo estar más que justificado en actuar como lo hizo. Máxime, cuando podía estar envuelta también la locura del peticionario al momento de cometer los delitos como eximente de responsabilidad. La orden de 20 de febrero de 1952 sobre el particular, ratificada plenamente por la orden de 18 de noviembre, nueve meses después, creó un estado procesal de derecho que debía resolverse únicamente a través del procedimiento estatuido en el Art. 441. No era discrecional del tribunal soslayar dicho procedimiento ni decretar la cordura del acusado sin intervención de los médicos o por otros medios, inclusive su propia discreción en una etapa posterior.

■ Si como cuestión de realidad el peticionario fue enjuiciado y sentenciado sin que se siguieran los procedimientos del Art. 441 y del 442, su enjuiciamiento y sentencia fueron nulos.

La Sala sentenciadora tuvo la impresión, por sus manifestaciones durante la vista y su conclusión final, que sólo podría decretar la nulidad de los procedimientos si en el hábeas corpus se le hubiera demostrado con prueba que efec-

tivamente el peticionario estaba loco al ser enjuiciado. Éste no era el problema. Por la misma razón de derecho que en el caso criminal el Tribunal estaba impedido de hacer su propia conclusión de que el acusado estaba cuerdo, la Sala sentenciadora lo estaba para hacer tal conclusión en el recurso de hábeas corpus.

La dificultad que presenta este caso es que por la insuficiencia del expediente criminal mismo, lo cual es lamentable en una corte de récord, no se pudo determinar a ciencia cierta si el peticionario antes de ser enjuiciado fue declarado cuerdo o no. Sin embargo, por ese solo hecho no se justifica el sostener la sentencia apelada. El hábeas corpus, una vez que se expide el auto, constituye esencialmente una encuesta que abre el propio Estado para investigar la validez de la privación de la libertad de uno de sus ciudadanos. En ese sentido la misión del tribunal no es la del mero árbitro pasivo de las controversias ordinarias adversativas que depende para fallar sólo de aquellos elementos de juicio que las partes en contrario tienen a bien someterle. Hay un interés primordial del Estado en un hábeas corpus, el que la verdad se esclarezca, habiendo de por medio la libertad del individuo. Entendemos que la Sala sentenciadora pudo haber hecho producir todos los elementos de juicio que pudieron haberse producido para hallar la verdad en este caso. Debió haber ordenado la transcripción de las notas taquigráficas de los procedimientos habidos en las causas criminales, lo que indudablemente hubiera arrojado luz sobre estos hechos. Debió haber insistido en oir el testimonio del médico citado o el de los otros médicos designados como peritos, el cual era factible producir. Pudo haber tenido los récords de la Cárcel de Distrito para determinar si durante todo el tiempo en que el peticionario estuvo en sumaria aguardando juicio fue o no enviado al Hospital de Siquiatría; pudo haber tenido los récords de este hospital. Toda esa prueba fundamentalmente constitutiva de récords oficiales de fácil acceso pudo haber ayudado a resolver la cuestión litigiosa.

Por estas consideraciones creemos nuestro deber el dejar sin efecto la sentencia apelada y devolver el caso a la Sala sentenciadora para que con esa prueba y cualquier otra pertinente, resuelva si este peticionario fue llevado a juicio sin que el tribunal de peritos médicos lo hubiera declarado cuerdo. Si a la luz de la prueba ése resultara ser el hecho, sus sentencias deberán anularse.

*Se dejará sin efecto la sentencia apelada y se devolverá el caso a la Sala sentenciadora para ulteriores procedimientos según lo indicado.*