EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pueblo de Puerto Rico<br>        Peticionario<br><br>                v.<br><br>Dionisio Santiago Torres<br>        Apelado-Recurrido | Certiorari<br><br>2001 TSPR 83 |

Número del Caso: CC-2000-551

Fecha: 8/junio/2001

Tribunal de Circuito de Apelaciones:
                                Circuito Regional V

Juez Ponente:
                        Hon. Liana Fiol Matta

Oficina del Procurador General:
                        Lcdo. Ricardo E. Alegría Pons
                        Procurador General Auxiliar

Abogado de la Parte Recurrida:
                        Lcdo. José E. Ayoroa Santaliz

Materia: Sodomia y Actos Lascivos e Impúdicos

        Este documento constituye un documento oficial del Tribunal Supremo que está
sujeto a los cambios y correcciones del proceso de compilación y publicación
oficial de las decisiones del Tribunal. Su distribución electrónica se hace
como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Pueblo de Puerto Rico

     Peticionario

       v.

                             CC-2000-551

Dionisio Santiago Torres


     Acusado-Recurrido


Opinión del Tribunal emitida por el Juez Asociado señor Corrada del Río


San Juan, Puerto Rico a 8 de junio de 2001.

En el caso de autos, el Procurador General, en representación del Pueblo de Puerto Rico, comparece ante nos solicitando la revocación de la sentencia del Tribunal de Circuito de Apelaciones (en adelante TCA) confirmando una resolución del Tribunal de Primera Instancia (en lo sucesivo TPI), mediante la cual decretó que el aquí recurrido no era procesable.

I

Dionisio Santiago Torres (en adelante Santiago Torres o el imputado) tiene un grado de retardación mental leve –un coeficiente intelectual de sesenta y cuatro (64)– y posee una edad mental de siete (7)

años, pese a contar con más de cuarenta (40). Alcanzó estudios académicos hasta el séptimo grado; sin embargo, no sabe leer ni escribir.

El 23 de diciembre de 1997, tras la celebración de la vista preliminar correspondiente, el Ministerio Público sometió contra Santiago Torres cinco (5) cargos por infringir el Art. 103 del Código Penal –sodomía–, 33 L.P.R.A. sec. 4065 (Supl. 2000), y un (1) cargo por violación del Art. 105 del Código Penal –actos lascivos o impúdicos–, *íd.*, sec. 4067 (Supl. 2000).[1]

Posteriormente, durante la lectura de acusación, celebrada el 23 de enero de 1998, la representación legal de Santiago Torres invocó como defensa la incapacidad mental de éste al momento de los hechos.[2] A tales fines, previa renuncia a los términos de juicio rápido, el abogado de Santiago Torres solicitó un señalamiento para traer al Dr. Capestany. Ante ello, el TPI, en virtud de la Regla 240 de Procedimiento Criminal, *supra*, paralizó los procedimientos, ordenó la evaluación de Santiago Torres por el Dr. Rafael Cabrera Aguilar (en adelante Dr. Cabrera), psiquiatra del Estado, y fijó la vista "para evaluación sobre **Procesabilidad e Inimputabilidad**" para el 27 de febrero de 1998. (Énfasis en el original.)[3]

Llegado el día, el TPI celebró la primera vista de procesabilidad, en la cual declararon tanto el Dr. Cabrera como el Dr. Capestany. Posteriormente, mediante resolución de 3 de junio de 1998, el TPI, luego de reseñar brevemente lo ocurrido en dicha vista, declaró no procesable a Santiago Torres. A tales efectos, expresó lo siguiente:

> [e]l doctor Cabrera contestó escuetamente que evaluó al imputado y [que] a su juicio éste se encuentra procesable.
>
> Por su parte, el doctor Capestani [sic] atestó que ha examinado y evaluado en múltiples ocasiones al imputado. De hecho preparó un detallado Informe de Evaluación Psiquiátrica que consta de once (11) páginas [,] además de abundante prueba documental. Concluyó el doctor Capestani [sic] que el imputado tiene síntomas muy serios de enfermedad mental tales como intelecto deficiente, funciones cognoscitivas afectadas, alucinaciones, delirios y pobre juicio, como consecuencia de lo cual tiene serios impedimentos para funcionar en el ámbito social, escolar y ocupacional.
>
> A juicio del doctor Capestani [sic] y por los fundamentos contenidos en su Informe y testimonio, el imputado no se encuentra procesable.
>
> Examinados cuidadosamente ambos testimonios periciales, a la luz de los examenes [sic] y evaluaciones practicadas al imputado, el Tribunal declara al imputado, Dionisio Santiago Torres: **NO PROCESABLE.**

---

[1] Las víctimas de los delitos alegados eran menores de catorce (14) años.

[2] Es menester señalar que en los autos obra copia de un escrito intitulado *Moción para Avisar la Defensa de Incapacidad Mental en el Momento de la Alegada Comisión del Delito Imputado*. Mediante dicho documento, **fechado el 3 de febrero de 1997 y sellado por el TPI el 4 de febrero de 1997**, la defensa, conforme a la Regla 74 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, dio aviso de que establecería la inimputablidad de Santiago Torres en la vista preliminar, la cual se llevaría a cabo el 18 de marzo de 1997. En conjunto con la referida moción, la defensa anejó varios documentos, entre otros, una evaluación psiquiátrica de Santiago Torres realizada por el Dr. Roberto A. Capestany (en adelante Dr. Capestany), psiquiatra. Apéndice de la petición de *certiorari*, págs. 16–18, 44–46.

[3] Apéndice de la petición de *certiorari*, págs. 47, 77. Véase, *íd.*, pág. 48.

Se dispone que el imputado continuará recibiendo tratamiento ambulatorio, como hasta el presente, bajo la tutela de su señor padre.(Énfasis y mayúsculas en el original.)[4]

Por último, el TPI señaló una vista de seguimiento para el 30 de octubre de 1998.

Tras múltiples suspensiones, finalmente, el 23 de septiembre de 1999 el TPI llevó a cabo una segunda vista de procesabilidad donde testificaron el Dr. López –quien expresó que el imputado cumplía con los requisitos de procesabilidad–[5] y el Dr. Capestany –que se reafirmó en que Santiago Torres no era procesable. Luego de escuchar los dichos testimonios periciales, el TPI reiteró que Santiago Torres no era procesable, ordenó la continuación del tratamiento y pautó otra vista de procesabilidad para el 17 de diciembre de 1999.

Así las cosas, llegado el día del señalamiento, las partes expusieron varios argumentos. La defensa, por su parte, solicitó que el TPI decretase la no procesabilidad permanente de Santiago Torres ya que éste padece de una condición insuperable. Por otra parte, el Ministerio Público planteó que "no [era] pertinente solicitar la inimputabilidad del imputado."[6] Sobre el particular, surge del acta de dicha vista lo siguiente:

[e]l Tribunal expone que no se está solicitando una inimputabilidad. Es que dentro del curso de este tipo de procedimiento en determinado momento se va a determinar si la persona es o no procesable. Se está repetidamente incurriendo en gastos por parte del estado [sic], aguardando el momento en que vía tratamiento o en alguna otra forma pueda ser procesable, cuando el caso es que nunca llegará el momento, porque la condición está congénitamente defectuosa.

A la luz de lo que el facultativo recomienda [,] el Tribunal concluye que es fútil el seguir evaluando a esta persona, porque las probabilidades de que un día resulte procesable es [sic] casi nula [sic], ya que las condiciones congénitas no son superables, por lo que no va a responder a ningún tratamiento. No es justo ni apropiado para el estado [sic] estar incurriendo en gastos. Por lo antes expuesto se exime de futuras vista [sic] de procesabilidad al imputado.[7]

En vista de ello, mediante resolución de 17 de diciembre de 1999, notificada el 4 de enero de 2000, el TPI declaró al imputado no procesable y, en virtud de la Regla 247(b) de Procedimiento Criminal, *supra*, ordenó el archivo y sobreseimiento de los cargos.

Inconforme, el 3 de febrero de 2000, el Procurador General acudió, vía *certiorari*, ante el TCA.[8] El 12 de mayo de 2000 el TCA dictó sentencia, notificada el 24 de mayo de 2000,

---

[4] *Íd.*, págs. 19–20, 49–50, 80–81.

[5] Véase, nota al calce núm. 38, *infra*.

[6] Apéndice de la petición de *certiorari*, pág. 92.

[7] *Íd.*, págs. 92–93.

**[8] Alegó, en síntesis, que el TPI erró: (1) al suspender los procedimientos, al amparo de la Regla 240 de Procedimiento Criminal, *supra*, sin base razonable, confundiéndose así con la Regla 74 de Procedimiento Criminal, *supra*, que trata sobre el procedimiento para invocar la defensa de incapacidad mental; (2) al determinar que un acusado con un grado de retardación mental moderada no es procesable; y (3) al no recluir al imputado como medida de seguridad, en virtud de la Regla 241(d) de Procedimiento Criminal, *supra*.**

confirmando la resolución del TPI. Oportunamente, el Procurador General recurrió ante nos imputando la comisión de los siguientes errores:

1. Incurrió en manifiesto error el Tribunal al convalidar el acto <u>contrario a derecho</u> del Tribunal de Primera Instancia al paralizar el proceso y aplicar la Regla 240 de Procedimiento Criminal, sin base razonable ante el mero aviso verbal de la defensa de que invocaría la Regla 74 de Procedimiento Criminal.

2. Incurrió en manifiesto error el Tribunal al no entender el planteamiento de que un imputado con retardación mental moderada es procesable. (Subrayado en el original.)

Luego de expedir el recurso y a bien de contar con las comparecencias de las partes, resolvemos.

II

La cuestión a determinar, en primer lugar, es si el TPI actuó correctamente al paralizar los procedimientos, bajo la Regla 240 de Procedimiento Criminal, *supra*, por razón del planteamiento de la incapacidad mental de Santiago Torres al momento de los hechos imputados. El Procurador General sostiene que ello no constituía base suficiente para la suspensión.

De entrada, es conveniente precisar que, en el ámbito penal, la incapacidad mental de un imputado es importante en dos (2) etapas, a saber: (1) al momento de la comisión de los hechos alegados, y (2) al momento y durante el proceso penal. *Pueblo v. Castillo Torres*, 107 D.P.R. 551, 554 (1978).

La primera es causa de inimputabilidad. A tales efectos, el Art. 30 del Código Penal, 33 L.P.R.A. sec. 3152, en lo pertinente, dispone que "[n]o es imputable el que en el momento del hecho, a causa de enfermedad o defecto mental, careciere de capacidad suficiente para comprender la criminalidad del acto o para conducirse de acuerdo con el mandato de ley." Es decir, la incapacidad mental es eximente de responsabilidad criminal. Por lo que, frente a la ausencia de tal capacidad, no cabe hablar de la responsabilidad penal del imputado. *Pueblo v. Ríos Maldonado*, 132 D.P.R. 146, 164-165 (1992); E. L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, 1ra reimp., Colombia, Ed. Forum, 1995, Vol. III, Sec. 29.1, pág. 251; O. E. Resumil, *Derecho Procesal Penal*, New Hampshire, Equity Publishing Company, 1990, T. I, Sec. 5.18, pág. 101.[9] A los fines de levantar y luego establecer la defensa de

---

[9] La falta de capacidad no tiene que ser total, sino aquélla suficiente para anular la capacidad de la persona de entender la criminalidad del acto o de conducirse conforme a la ley. *Pueblo v. Ríos Maldonado*, supra, pág. 165; *Pueblo v. Montes Vega*, 118 D.P.R. 164, 169 (1986); *Pueblo v. Marcano Pérez*, 116 D.P.R. 917, 927 (1986). Véase, P. Malavet Vega, *Manual de Derecho Penal Puertorriqueño*, Mayagüez, Ed. Barco de Papel, 1997, pág. 235; D. Nevares-Muñiz, *Derecho Penal Puertorriqueño, Parte General*, 4ta ed., Hato Rey, Instituto para el Desarrollo del Derecho, Inc., 2000, págs. 298-299, 304.

Por otra parte, de no nublar dicho entendimiento completamente, la reducción en capacidad mental podría atenuar o aminorar la responsabilidad penal de la persona. *Pueblo v. Montes Vega*, supra, págs. 172-173; *Pueblo v. López Rivera*, 109 D.P.R. 160, 166-167 (1979). Véase, Malavet Vega, *op. cit.*, pág. 237.

incapacidad mental, cónsono con la Regla 74 de Procedimiento Criminal, *supra*, el acusado tiene que presentar un aviso ante el tribunal y notificar el mismo al Ministerio Fiscal.[10]

Ahora bien, distinta es la situación tratándose de la capacidad o incapacidad mental de la persona al momento de encarar el proceso judicial en su contra. En este supuesto, entonces, nos referimos a la procesabilidad del imputado. *Pueblo v. Castillo Torres*, supra, pág. 555. La Regla 239 de Procedimiento Criminal, *supra*, establece que "[n]inguna persona será juzgada, convicta o sentenciada por un delito mientras esté mentalmente incapacitada." Ello tiene como propósito "impedir que se someta a juicio a un reo que es incapaz de comprender la naturaleza y propósito de los procedimientos que contra él se siguen, y como consecuencia, de defenderse adecuadamente." *Pueblo v. Cruz Román*, 84 D.P.R. 451, 457-458 (1962) (resuelto bajo los Arts. 439 y siguientes del Código de Enjuiciamiento Criminal, precursores de las reglas vigentes). El Profesor Chiesa, en lo referente, expresa que "se trata de una exigencia de que el acusado pueda entender la naturaleza de los procedimientos, de forma que pueda ayudar –a su abogado y a sí mismo– a su mejor defensa." Chiesa Aponte, *op. cit.*, pág. 252.

En virtud de dicho mandato, la Regla 240 de Procedimiento Criminal, *supra*, en lo atinente, dispone que:

> "[e]n cualquier momento después de presentada la acusación o denuncia y antes de dictarse la sentencia, *si el tribunal tuviere base razonable para creer que el acusado está mentalmente incapacitado, inmediatamente suspenderá los procedimientos y señalará una vista para determinar el estado mental del acusado*. Deberá el tribunal designar uno o varios peritos para que examinen al acusado y declaren sobre su estado mental. Se practicará en la vista cualquier otra prueba pertinente que ofrezcan las partes." (Bastardillas nuestras.)

Sobre el particular, en *Pueblo v. Rodríguez Galarza*, 117 D.P.R. 455, 457 (1986), citando con aprobación al Procurador General, expresamos que "la Regla le concede inicialmente al tribunal total discreción en la determinación de si existe base razonable o no para creer que el acusado está mentalmente incapacitado."[11] Véase, *Camareno Maldonado v. Tribunal Superior*, 101 D.P.R.

---

[10] Cabe recordar que es principio firmemente establecido que nuestro ordenamiento jurídico presume la cordura del imputado. Ello implica que, de no rebatirse dicha presunción, el Ministerio Fiscal no tiene que introducir prueba sobre la capacidad mental del individuo. No obstante, de presentar la defensa prueba suficiente o de surgir de la prueba de cargo duda razonable sobre la capacidad mental del imputado al momento de los hechos, le incumbe al Ministerio Fiscal probar la cordura del acusado "como cualquier otro elemento del delito[,]" esto es, más allá de duda razonable. *Pueblo v. Ríos Maldonado*, supra, pág. 168; *Pueblo v. Montes Vega*, supra, pág. 170, citando a *Pueblo v. Marcano Pérez*, supra, págs. 927-928. Véase, Chiesa Aponte, *op. cit.*, pág. 251, n. 1.

[11] Tal determinación está sujeta a revisión bajo el criterio de abuso de discreción. Chiesa Aponte, *op. cit.*, Sec. 29.2, pág. 257. Véase, *Pueblo v. Cruz Román*, supra, pág. 458; *Pueblo v. Báez*, 67 D.P.R. 301, 302 (1947) (ambos resueltos bajo el Art. 440 del Código de Enjuiciamiento Criminal, de donde procede la Regla 240 de Procedimiento Criminal, *supra*, vigente.)

552, 562 (1973); *Córcoles Droz v. Jefe Penitenciaría*, 89 D.P.R. 1, 10 (1963); *Pueblo v. Cruz Román*, supra; T. Grisso, *Evaluating Competencies*, 2nd print., New York, Plenum Press, 1988, pág. 65.

No obstante, una vez estima que hay base razonable, el tribunal tiene que paralizar *ipso facto* todos los procedimientos, señalar una vista para determinar la condición mental del imputado, y nombrar uno o varios peritos para que evalúen al imputado y atestigüen sobre su condición mental. *Pueblo v. Rodríguez Galarza*, supra; *Pate v. Robinson*, 383 U.S. 375, 385 (1966); Chiesa Aponte, *op. cit*. Ello es mandatorio, máxime cuando el encausar a una persona no procesable viola el debido proceso de ley. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *Medina v. California*, 505 U.S. 437, 453 (1992) ("the criminal trial of an incompetent defendant violates due process."); *Drope v. Missouri*, 420 U.S. 162, 172 (1975); *Pate v. Robinson*, supra, pág. 378; *Bishop v. United States*, 350 U.S. 961 (1956). Véase, Stephen J. Kane, *Competency to Stand Trial*, 87 Geo. L. J. 1463, 1467 (1999).

En la situación de autos, durante la lectura de acusación, la representación legal de Santiago Torres levantó como defensa la incapacidad mental de éste al momento de la comisión de los hechos y expresó que, a tales efectos, traería al Dr. Capestany para probar dicha defensa. Ante ello, el TPI, a su discreción, estimó prudente, al amparo de la Regla 240 de Procedimiento Criminal, *supra*, suspender los procedimientos, referir a Santiago Torres al Dr. Cabrera para una evaluación, y señalar una vista sobre inimputabilidad y procesabilidad. El simple planteamiento de la inimputabilidad de Santiago Torres *per se* no constituía base razonable para creer que éste se encontraba mentalmente incapacitado y activar los procedimientos al amparo de la Regla 240 de Procedimiento Criminal, *supra*, ya que los criterios para determinar la inimputabilidad y la procesabilidad de una persona son diferentes e independientes.[12] Véase, Kane, *op. cit*., pág. 1463, n. 1405.

No obstante, en el expediente ante nos, obra una moción que sometió la representación legal de Santiago Torres ante el TPI avisando que presentaría la defensa de incapacidad mental en la vista preliminar.[13] Junto a dicha moción, el abogado del imputado acompañó copia de los documentos en los cuales se basó el Dr. Capestany para emitir su opinión, la cual también incluyó. Entre éstos se encontraban: (1) tarjeta de citas; (2) evaluación psiquiátrica realizada por el Dr. Ubaldo Bocanegra; (3) certificado de hospitalizaciones en el Hospital de Psiquiatría de Ponce; y (4) parte verbal del WAIS test, BG test y dibujos de personas.[14] A nuestro entender, de dichos documentos surgía base razonable para creer que Santiago Torres

---

[12] "A defendant may be competent to stand trial yet have good grounds for an insanity defense." T. Grisso, *op. cit*., pág. 64.

[13] Véase, nota al calce núm. 2, *ante*.

[14] Según se desprende de dicha moción, también se anejó copia de: (1) la entrevista con Santiago Torres; (2) la entrevista con su madrastra; y (3) el

se hallaba mentalmente incapacitado al momento de la lectura de acusación. Además, conforme al expediente, el Ministerio Fiscal, no objetó tal determinación durante la lectura de acusación ni en las posteriores vistas de procesabilidad. A la luz de todas las circunstancias, el TCA concluyó correctamente al resolver que el TPI no abusó de su discreción al paralizar los procedimientos conducentes al juicio de Santiago Torres.

III

Por otra parte, en su segundo señalamiento de error, el Procurador General señala que la prueba pericial no es suficiente para sostener la no procesabilidad de Santiago Torres ya que éste no posee un grado de retardación mental que justifique tal determinación.

A

La retardación mental es una condición diagnosticada antes de los dieciocho (18) años de edad que se caracteriza por funciones intelectuales significativamente pobres –por debajo del nivel promedio– y limitaciones considerables a la capacidad de adaptación. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 4th ed. (DSM-IV), Washington, DC, APA, 1994, pág. 39. Véase, D. Courselle *et al.*, *Suspects, Defendants and Offenders with Mental Retardation in Wyoming*, 1 WYO. L. REV. 1 (2001); D. W. Keyes *et al.*, *Mitigating Mental Retardation in Capital Cases: Finding the "Invisible" Defendant*, 22 MENTAL & PHYSICAL DISABILITY L. REP. 529, 530 (1998).[15]

A tales fines, el nivel de las funciones intelectuales se mide mediante la administración de pruebas sicométricas,[16] a través de las cuales se determina el coeficiente de inteligencia o coeficiente intelectual (conocido por sus siglas en inglés como I.Q.) del individuo.[17] Un coeficiente intelectual de setenta (70) o menos, con un margen de error de cinco (5) puntos,

---

historial académico. Dichos documentos, sin embargo, no obran en los autos ante nos.

[15] "Mental retardation requires onset of the condition prior to the age of eighteen because an essential characteristic of mental retardation involves diminished developmental growth." D. Courselle *et al.*, op. cit.

No obstante lo anterior, al definir retardación mental, la Asociación Americana sobre Retardación Mental (conocida por sus siglas en inglés como la AAMR) extendió el diagnóstico hasta los veintidós (22) años. *Íd.*, n. 90.

[16] "Psychometric testing is the administration of psychological tests for the purpose of obtaining an objective picture of a patient´s intelligence and personality to aid in the accurate diagnosis of mental disorders and provide guidelines for treatment." Ausman & Snyder's *Medical Library, Lawyers Edition*, Vol. 5, Sec. 8:77, pág. 475.

[17] El coeficiente de inteligencia "es igual al cociente entre la edad mental de la persona y su edad cronológica, multiplicado por 100. La edad mental de una persona es equivalente a la del grupo de población que, estadísticamente, presenta un desarrollo intelectual similar al de dicha persona, y se calcula en función de los resultados de diversas pruebas de inteligencia...." M. S. Gisbert Grifo y otros, *Glosario de Psiquiatría Forense para Médicos y Juristas*, Barcelona, Masson, S. A., 1995, pág. 42.

refleja una disminución significativa de tales funciones,[18] elemento esencial para un diagnóstico de retardación mental. DSM–IV, *op. cit.*[19] Empero, dicha puntuación por sí sola no es indicativa de retardación mental ya que el coeficiente de inteligencia sólo considera las facultades intelectuales, y no a las facultades de adaptación.[20] I. Mickenberg, *Competency to Stand Trial and the Mentally Retarded: The Need for a Multi–Disciplinary Solution to a Multi–Discplinary Problem*, 17 CAL. W. L. REV. 365, 390–391 (1981). A esos efectos, Keyes expresa:

> [s]cores on tests of adaptive ability and an analysis of coping skills must be significantly below average, as well. Often, too much is made of the IQ score alone as though it were the sole indicator of mental retardation. A low IQ score without deficits in adaptive functioning is not defined as mental retardation. Conversely, poor adaptive skills in the presence of average intelligence is not mental retardation, either. D. W. Keyes *et al.*, *op. cit.*, pág. 531.[21]

Respecto a dichas facultades, una persona con retardación mental tiene limitaciones significativas en al menos dos (2) de las siguientes áreas: comunicación, aseo personal, convivencia familiar, destrezas sociales e interpersonales, uso de los recursos comunitarios, autocontrol, destrezas académicas, trabajo, entretenimiento, salud y seguridad. DSM–IV, *op. cit*, pág. 39.

Finalmente, cabe mencionar que, el nivel de severidad de la retardación mental de un individuo se cataloga en función del coeficiente intelectual obtenido, a saber: leve o media (50 a 70), moderada (35 a 49), severa (20 a 34) y profunda (menos de 20). M. S. Gisbert y otros, *op. cit.*, pág. 178. Véase, DSM–IV, *op. cit.*, pág. 40.

B

No obstante las limitaciones que conlleva la retardación mental, un tribunal podría encontrar procesable a un imputado con dicha condición.[22] Es decir, un diagnóstico de retardación mental no equivale necesariamente a un dictamen de no procesabilidad.[23]

---

[18] Una persona con funciones intelectuales normales tiene un coeficiente de inteligencia entre noventa (90) y ciento diez (110). *Íd.*

[19] Cabe precisar que es muy importante tener presente qué instrumento o prueba se utilizó para medir el coeficiente de inteligencia. Véase, *íd.*

[20] Adaptación es el nivel de una persona en comparación con los criterios de independencia personal y responsabilidad social de una persona similar, es decir, de igual edad y mismo grupo cultural. D. H. J. Hermann *et al.*, *Sentencing of the Mentally Retarded Criminal Defendant*, 41 ARK. L. REV. 765, 774 (1988). Véase también, DSM–IV, *op. cit.*, pág. 40.

[21] "Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." DSM–IV, *op. cit*, págs. 39–40.

[22] "However, the fact that a person is mentally retarded does not necessarily mean that the person is incompetent to stand trial." D. H. J. Hermann *et al.*, *op. cit.*, pág. 785.

[23] Para decisiones de tribunales estatales y federales donde personas con retardación mental han sido halladas tanto procesables como no procesables,

Un tribunal, al momento de determinar la procesabilidad del imputado, evalúa si éste puede consultar con su abogado con un grado razonable de entendimiento y si comprende, de forma racional y fáctica, la naturaleza y propósito del proceso. *Drope v. Missouri*, supra; *Dusky v. United States*, 362 U.S. 402 (1960). Véase, *Pueblo v. Cruz Román*, supra, págs. 457-458. Es decir, un individuo es procesable si posee la capacidad necesaria para: (1) entender la naturaleza y objeto de los procedimientos en su contra; (2) asesorarse con su abogado; y (3) colaborar en su defensa. *Drope v. Missouri*, supra, pág. 171 ("a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.") Véase, Chiesa Aponte, *op. cit.*, Sec. 29.1, págs. 252-253; Sec. 29.2, pág. 258.[24]

La comprensión de la naturaleza y propósito de los procedimientos por parte del imputado va más allá de un mero conocimiento del proceso criminal en su contra. *People v. Swallow*, 301 N.Y.S. 2d 798, 802-803 (1969). El tribunal debe considerar varios factores, a modo de mención, si el individuo entiende racionalmente: (1) los cargos imputados; (2) el rol del juez o jurado, del fiscal y la defensa; (3) los derechos que le cobijan; (4) las diferentes alegaciones –Regla 68 de Procedimiento Criminal, *supra*– y sus consecuencias; (5) los posibles veredictos –Regla 146 de Procedimiento Criminal, supra– y sus efectos, ello incluye que de ser hallado culpable procede la imposición de una sentencia. Silten & Tullis, *Mental Competency in Criminal Proceedings*, 28 Hastings L. J. 1053, 1061 (1977).

Por otra parte, al indagar sobre la capacidad del acusado para consultar con su abogado y colaborar en su defensa, debe considerarse, *inter alia*, la capacidad del primero de: (1) comunicarse efectivamente con su abogado; (2) cooperar eficazmente con su abogado; (3) recordar y relatar hechos relacionados con sus acciones; (4) seguir instrucciones; (5) identificar testigos, ayudar a localizarlos y a interrogarlos; (6) tomar decisiones, luego de una completa explicación de las alternativas; (7) testificar eficientemente y, a su vez, ser contrainterrogado. Véase, Silten & Tullis, *op. cit.*, págs. 1062-1064.

Ahora bien, de tener ante sí una persona con retardación mental, un tribunal no puede limitarse a considerar el coeficiente intelectual para determinar la procesabilidad. También debe enfocarse en el efecto adverso de tal condición sobre los factores relevantes a la

---

véase, D. B. Dove, *Competency to Stand Trial of Criminal Defendant Diagnosed as "Mentally Retarded" – Modern Cases*, 23 A.L.R. 4th 493 (1983).

[24] En *Camareno Maldonado v. Tribunal Superior*, supra, pág. 560, al considerar si estar pensionado por incapacidad mental constituía impedimento para dictar sentencia, por razón de encontrarse mentalmente incapacitado, indicamos que "[l]o determinante es si el acusado, en el momento en que es llamado para dictarle sentencia, es incapaz de comprender la naturaleza y propósito de los procedimientos y de participar en el acto, con plena consciencia de su significado, y con oportunidad de expresarse sobre las razones que a su juicio impidan que se dicte sentencia."

procesabilidad. I. Mickenberg, *op. cit.*, pág. 391.[25] Esto es, juzgar cómo afecta la disminución en las facultades intelectuales y adaptativas la habilidad del imputado de entender el proceso criminal, comunicarse con su abogado y ayudar en su defensa. El tribunal debe prestar particular atención a la capacidad de memoria, de comunicación, de formar un juicio, de razonamiento, de lidiar con el estrés y la ansiedad, y, sobre todo, de percepción del proceso criminal. Véase, I. Mickenberg, *op. cit.*, págs. 392-400. Ante ello, para tener un cuadro más completo, resulta de gran ayuda que la evaluación del perito exponga tales efectos.[26]

No obstante lo anterior, del individuo sufrir un grado de retardación severo o profundo, al tener limitaciones considerables tanto en su capacidad de razonamiento como de comunicación evidentes, que no pocas veces hieren la retina, el tribunal decretará la no procesabilidad de éste.[27] Empero, cuando el individuo presenta un nivel de retardación mental leve o moderado, el tribunal pondrá atención a los efectos de dicha condición sobre las capacidades necesarias para ser hallado procesable.[28]

---

**[25] "[T]he narrow purpose of the *Dusky* test is to determine the effect, if any, that a defendant's mental impairment**

continúa...

**[25] ...continuación**

**can be expected to have on his ability to function adequately during trial." Silten & Tullis, *op. cit.*, pág. 1060.**

[26] Sin embargo, no podemos perder de perspectiva que la última palabra sobre la procesabilidad de un imputado la tiene el tribunal. La declaración de la procesabilidad o no procesabilidad de una persona no es una determinación médica sino una legal, la cual le corresponde al juez. *Íd.*, págs. 376-377.

[27] A nivel preescolar, en las personas con un grado de retardación mental severo, quienes constituyen de 3% a 4% de la población con retardación mental, es posible descubrir "un lenguaje y un desarrollo motor muy pobre, lo que condiciona una comunicación escasa. Pueden aprender un *lenguaje* muy elemental, así como hábitos básicos de higiene

continúa...

[27] **...continuación**
personal, pero no pueden aprovechar eficazmente un entrenamiento laboral, incluso si se refiere a tareas muy elementales." (Bastardillas en el original.) M. S. Gisbert y otros, *op. cit.* Véase, DSM-IV, *op. cit.*, pág. 41.

Respecto a las personas con retardación mental profunda, quienes componen del 1% al 2% del grupo con retraso mental, "[l]a comunicación es mínima, ya que existen dificultades para la articulación de la palabra; no llegan a aprender ni siquiera hábitos higiénicos y, con alguna frecuencia, no identifican a las personas de su entorno más inmediato." M. S. Gisbert y otros, *op. cit.*, pág. 178. Las destrezas motoras y de comunicación pueden mejorar si se provee el entrenamiento adecuado. DSM-IV, *op. cit.*, pág. 42.

[28] En *Pueblo v. Ríos Maldonado*, supra, resolvimos que una persona con retardación mental severa o profunda de por sí es inimputable. No obstante, expresamos que, al no ser inimputable *per se* aquél que sufre de retardación mental leve o moderada, debía "recurrir[se] a los hechos para determinar si la conducta adaptativa del acusado, antes y durante los hechos, demuestra que

En el caso de autos, el TPI –en tres (3) ocasiones distintas, a través de dos (2) jueces diferentes– declaró a Santiago Torres no procesable. Éste presenta un coeficiente intelectual de sesenta y cuatro (64) –lo que significa un nivel de retraso mental leve– y posee una edad mental aproximada de siete (7) años. En su última determinación, el TPI declaró al imputado no procesable y procedió con el archivo y sobreseimiento de los cargos. Ante lo cual, el Procurador General impugnó tal dictamen del TPI fundando su contención en que el grado de retardación mental de Santiago Torres no era suficiente para declararlo no procesable.

En vista de lo señalado previamente, teniendo en cuenta el grado de retardación mental del imputado y a los fines de determinar la corrección del dictamen del TPI, resulta necesario juzgar la prueba pericial para evaluar cuán afectadas se hallaban las capacidades necesarias para cumplir con el criterio de procesabilidad. Pese a que el Procurador General no presentó una exposición estipulada o una transcripción de los testimonios vertidos por los peritos ante el TPI –incluyendo el del Dr. López–,[29] entendemos que el TPI actuó correctamente. Veamos.

En los autos obra tanto la evaluación psiquiátrica realizada por el Dr. Cabrera como la confeccionada por el Dr. Capestany. El Dr. Cabrera, quien posteriormente se inhibió en el caso, examinó al acusado a los fines de una determinación de inimputabilidad,[30] por lo que su evaluación principalmente se dirigió a tales efectos. Expresó que el imputado tenía una actividad motora adecuada –"no defectos en la marcha [,] tics o manerismos"–,[31] un flujo de pensamiento también adecuado pero un juicio menoscabado. Respecto a la memoria, expuso que estaba "[c]onservada con lagunas en la remota."[32] El Dr. Cabrera, además, señaló que Santiago Torres posee un grado de "escolaridad muy pobre [,] completando apenas el septimo [sic] grado sin saber leer o escribir...."[33] Añadió que "[d]esde la edad de siete años ha presentado historial siquiatrico [sic] con multiples [sic] hospitalizaciones en el [C]entro de [S]alud [M]ental de Ponce, se le diagnostico [sic] Ezquisofrenia [sic] Crónica Paranoide y se decribe [sic] conducta bizarra, alucinaciones y episodios sicoticos [sic]."[34]

Indicó, además, que Santiago Torres tiene un funcionamiento social adecuado y que éste goza del aprecio de las personas debido a su cooperación. De igual forma, mencionó que, tras interrogarlo sobre los hechos alegados, Santiago Torres negó haberlos cometido. Por último,

---

éste podía actuar de otra manera o si incurrió en el delito en virtud de no comprender los alcances antijurídicos de su obrar." *Íd.*, pág. 167.

[29] Conforme a los autos ante el TCA, el 23 de marzo de 2000, el Procurador General presentó *Moción Solicitando se Exima al Peticionario de Presentar Exposición Estipulada de la Prueba*. Ello, debido a que, a su juicio, "[e]n el Auto de Certiorari del Peticionario no se plantea[ba] ninguna cuestión relacionada con errores en la apreciación de la prueba o con su suficiencia...."

[30] Es menester aclarar que no se encuentra ante nos planteamiento alguno sobre la imputabilidad o inimputabilidad de Santiago Torres.

[31] Apéndice de la petición de *certiorari*, pág. 119.
[32] *Íd.*

[33] *Íd.*, pág. 120.

luego de expresar que a su entender el imputado posee la capacidad para conocer la criminalidad de los delitos imputados, el Dr. Cabrera concluyó que, descartando los episodios sicóticos, Santiago Torres no era inimputable.

El Dr. Capestany, quien gozó de entera credibilidad por parte del TPI, en la parte pertinente de los hallazgos clínicos, expresó lo siguiente:

> [e]s poco comunicativo, parco al hablar, pero coherente y relevante en lo poco que dice; a veces hay que repetirle las preguntas y darle tiempo extra para contestar. Está bien orientado en persona y lugar; parcialmente desorientado en tiempo.

> Su nivel intelectual está muy por debajo de lo normal en todas las áreas: pobre capacidad para el pensamiento abstracto, muy mal informado con escasos conocimientos e información general, juicio social deficiente, conocimientos nulos en aritmética, memoria inmediata, reciente y remotas muy defectuosas, vocabulario sumamente limitado y pobre sentido de introspección. Obtuvo un IQ de 64 en la parte verbal del WAIS Test (retardación leve).

> Contenido de su pensamiento está saturado de pensamientos obsesivos negativos, alucinaciones y delirios [.] Oye voces desconocidas de hombres que le dicen que se mate, que se pegue un tiro o se tire delante de un camión; otras veces les [sic] dicen "debes matarte, estás sufriendo, no echas pa'lante". Ve cadáveres, cerebros, calaveras, muertos. Sueña mucho con la muerte. Expresa que tiene deseos de morir, siente que nadie en el mundo lo quiere y que ha sufrido demasiado desde la muerte de su mamá. Unas veces siente deseos de matarse porque no le gusta la vida y otras para obedecer las voces que lo mandan a matarse.

> Su afecto es moderadamente deprimido y sus estados de ánimo lábiles con ansiedad y pérdida de control en ocasiones.

> Es cooperador durante la evaluación, trata de hacer lo mejor que puede pero hay que repetirle las preguntas y darle tiempo extra a veces. Pierde concentración y se nota marcada deficiencia en el uso de las manos, distorsión en su capacidad perceptiva y falta de coordinación visual motora en la prueba Visual Motora de Bender-Gestalt (equivalente a una edad mental aproximada de 7 años de edad.)[35]

Finalmente, tras diagnosticarle retardación mental leve y esquizofenia paranoide, el Dr. Capestany concluyó que el imputado tenía "síntomas muy serios de enfermedad mental como: intelecto deficiente, funciones cognoscitivas afectadas, alucinaciones y delirios, pobre juicio. Como consecuencia de lo cual tiene serios impedimentos para funcionar en el ámbito social, escolar y ocupacional."[36]

El informe del Dr. Capestany es sumamente revelador. Establece claramente, en primer lugar, el efecto del retraso mental de Santiago Torres sobre sus capacidades funcionales, lo cual, entre otras cosas, le impidió tener un aprendizaje escolar adecuado y concluir sus estudios académicos.[37] Manifiesta, en segundo lugar, que el imputado padece de esquizofrenia paranoide y de alucinaciones, lo cual agrava su condición mental.

---

[34] *Íd.*

[35] *Íd.*, págs. 102-104.

[36] *Íd.*, pág. 105.

[37] Sobre este particular, en el historial persónal del imputado, el Dr. Capestany indicó:

A tenor de lo anterior y debido a que el Dr. Capestany evaluó al imputado en múltiples ocasiones durante el tiempo en que se celebraron las vistas, resulta forzoso concluir que el TPI no erró al determinar que el imputado no se encontraba procesable. Por otra parte, no podemos obviar que, aun cuando al considerar prueba pericial nos encontramos en igual posición que el TPI, fue éste quien tuvo la oportunidad de observar, escuchar los testimonios de los peritos, incluyendo el del Dr. López, y, a su vez, dirimir su credibilidad.[38] Ello, máxime cuando el Procurador General no presentó una exposición narrativa de la prueba. *Rafael Hernández Barreras y otros v. San Lorenzo Construction Corp.*, res. el 20 de febrero de 2001, 2001 TSPR 18, 153 D.P.R. ___ (2001), 2001 JTS 22, págs. 877-878.

IV

Si bien concurrimos con la declaración de no procesabilidad del imputado en las vistas de seguimiento, el TPI debió señalar una vista con el propósito de determinar la no procesabilidad permanente del imputado, con la debida notificación a las partes, previo al archivo y sobreseimiento de los cargos imputados. La determinación de no procesabilidad permanente de un imputado requiere la celebración de una vista más formal y, por así decirlo,

---

[d]e los expedientes escolares se puede inferir que Dionisio asistió por primera vez a la escuela Baldorioty de Ponce a los siete años en 1963, cuando aún vivía con su madre, Doña Irene, pero que aparentemente cursó ese año como oyente y que regresó al mismo grado como estudiante regular en 1964, es decir, estuvo dos años en primer grado. Estuvo también dos años en segundo grado en la misma escuela y de allí fue promovido al tercer grado y transferido a la Escuela Julio S. Ribas. Aquí terminó el tercer grado, pero al finalizar el curso, fue bajado al primer grado en la misma escuela y, al término del curso, fue promovido al segundo grado y transferido a la Escuela de Playita Cortada en Santa Isabel, donde terminó el séptimo grado en 1972. Aparentemente estuvo 10 años en la elemental durante los cuales estuvo dos años en primer grado, tres años en segundo grado y dos años en tercer grado; del cuarto al séptimo grado los hizo en un año cada uno. Se graduó de séptimo grado en mayo de 1972 sin saber leer ni escribir (sólo su nombre). *Íd.*, págs. 98-99.

[38] Según se desprende del escrito del Procurador General, el Dr. López, tras evaluar a Santiago Torres y considerar los criterios básicos para establecer la procesabilidad de una persona, opinó que éste: (1) "tiene una noción bastante completa de los hechos que se le imputan y que los mismos son contrarios a la [l]ey;" (2) "entiende que su abogado fue contratado por su padre para defenderle y conoce el rol que le corresponde al fiscal y al juez. Además, niega consistentemente haber cometido los hechos que se le imputan, lo que sirve para demostrar que puede colaborar con su defensa;" (3) "se mantiene en contacto con la realidad, no presenta cuadro sicótico a pesar de su nivel de retardación mental. Mantiene el control de sus actos durante las vistas judiciales y se comporta adecuadamente en los tribunales." Petición de *certiorari*, pág. 3.

más rigurosa que una mera vista de seguimiento. Ello, debido a las consecuencias de decretar la no procesabilidad permanente de una persona.

Frente a una determinación de no procesabilidad permanente de un individuo, el Estado tiene dos (2) opciones, a saber: dejarlo en la libre comunidad o iniciar los procedimientos de internación civil. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). A tales fines, al plantearse, de un lado, la posibilidad de la liberación, y, de otro lado, la restricción a la libertad, hay varios intereses en juego. El Estado tiene, bajo el poder de *parens patriae*, un interés legítimo en cobijar y proveerle al individuo aquél cuidado que por razón de su condición no puede brindárselo él mismo, incluyendo un tratamiento que mejore su condición, *Heller v. Doe*, 509 U.S. 312, 332 (1993); *Addington v. Texas*, 441 U.S. 418, 426 (1979); bajo su poder regulador ("police power"), un interés de proteger a la ciudadanía en general ante el posible peligro que representa el individuo, *Seling v. Young*, 121 S. Ct. 727, 734 (2001); *Kansas v. Hendricks*, 521 U.S. 346, 363 (1997); *Heller v. Doe*, supra; *Addington v. Texas*, supra; y, por último, bajo ambos poderes, un interés de prevenir que el individuo se haga daño a sí mismo. D. H. J. Hermann, *Barriers to Providing Effective Treatment: A Critique of Revisions in Procedural, Substantive, and Dispositional Criteria in Involuntary Civil Commitment*, 39 VAND. L. REV. 83, 95 (1986). El imputado, de otra parte, posee un interés fundamental de que no se restrinja su libertad sin el debido proceso de ley. Véase, *Addington v. Texas*, supra, pág. 425; *Jackson v. Indiana*, supra, pág. 731.

A tales efectos, el tribunal notificará a las partes —y, éstas, a su vez, a los peritos— la celebración de una vista a los fines de determinar si el imputado es o no procesable permanentemente, de modo que todos los comparecientes acudan preparados. En dicha vista, el tribunal recibirá prueba pericial relativa a la probabilidad del imputado de advenir procesable en un futuro próximo. De estimar que no existe probabilidad sustancial de que el imputado llegue a ser procesable en un futuro razonable o de que no es procesable permanentemente, el tribunal lo declarará no procesable permanentemente.

De igual forma, durante la vista, las partes también presentarán prueba a los efectos de determinar si debido a su condición mental, el imputado constituye un riesgo para sí y para la sociedad. De concluir el tribunal que, por razón de su estado mental, el individuo es un riesgo para sí mismo o para otras personas, dispondrá que en un término razonable[39] se inicien los procedimientos para que éste reciba tratamiento de conformidad con la Ley Núm. 40 de 2 de octubre de 2000, conocida como la Ley de Salud Mental de Puerto Rico (en adelante Ley de Salud Mental).

Es decir, en el supuesto de no procesabilidad permanente, el tribunal, tras considerar el grado de peligrosidad del individuo —tanto para sí como para la sociedad— *como consecuencia*

---

[39] La Corte de Apelaciones del Distrito de Columbia determinó que el término de treinta (30) días es uno razonable a los fines de que el Estado comience los procedimientos de internación civil. *Thomas v. U.S.*, 418 A. 2d 122 (1980).

*de su condición mental*, archivará los cargos en su contra y, lo pondrá en libertad o dispondrá que se inicien los procedimientos conforme a la Ley de Salud Mental.[40]

Resolvemos, por tanto, que de transcurrir un tiempo razonable sin hallar procesable a un imputado, deberá señalarse una vista para determinar si éste es no procesable permanentemente. El tribunal notificará y celebrará una vista exclusivamente a tales fines, en donde de determinar la no procesabilidad permanente, archivará los cargos, y dispondrá si lo libera o si ordena que se proceda con los trámites de internación civil, conforme con la Ley de Salud Mental, *supra*.

V

Por los fundamentos que anteceden, modificamos la sentencia del Tribunal de Circuito de Apelaciones a los fines de ordenar la celebración de una vista de no procesabilidad permanente. Así modificada, se confirma y devolvemos el caso de autos al Tribunal de Primera Instancia, Sala Superior de Ponce, para la continuación de los procedimientos de manera consistente con lo aquí resuelto.

BALTASAR CORRADA DEL RIO
JUEZ ASOCIADO

---

[40] El Art. 5.05 de la Ley de Salud Mental, *supra*, dispone que:

[t]odo adulto que reúna los criterios necesarios para recibir servicios transicionales y represente un riesgo inmediato para sí, para otros o la propiedad, de acuerdo a las evaluaciones y recomendaciones del psiquiatra y del equipo inter o multidisciplinario, pero que no consienta o no esté capacitado para consentir a tales servicios, será objeto de una petición de tratamiento compulsorio, o ingreso involuntario ante el tribunal, de conformidad a los procedimientos dispuestos en esta Ley para estos fines.

Es necesario precisar que el presentar una petición bajo la referida ley no implica que el imputado será internado en una institución mental. "Ninguna persona será ingresada de forma involuntaria, a menos que mediante prueba clara y convincente que a satisfacción del tribunal evidencie que representan un riesgo inmediato para sí, para otros o la propiedad y la necesidad de tal ingreso." Art.

continúa...

[40] ...continuación
4.12 de la Ley de Salud Mental, *supra*.

Además, el tribunal guiado por el principio de la alternativa menos restrictiva, de cumplirse con los criterios, podría ordenar otras alternativas que no son la hospitalización, entre otras, "tratamiento ambulatorio, hospitalización parcial o mantenimiento con medicamento." Véase, Art. 1.06 (nnn) de la Ley de Salud Mental, *supra*. El Art. 2.03 de la Ley de Salud Mental, *supra*, fija los requisitos que debe poseer una persona para que un tribunal, dentro de los procedimientos de internación civil, ordene el tratamiento compulsorio, en forma ambulatoria o a través de la hospitalización.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pueblo de Puerto Rico

    Peticionario

        v.                       CC-2000-551

Dionisio Santiago Torres

    Acusado-Recurrido

SENTENCIA

San Juan, Puerto Rico, a 8 de junio de 2001.

Por los fundamentos expuestos en la Opinión precedente, la cual se hace formar parte de esta sentencia, modificamos la sentencia del Tribunal de Circuito de Apelaciones a los fines de ordenar la celebración de una vista de no procesabilidad permanente. Así modificada, se confirma y devolvemos el caso de autos al Tribunal de Primera Instancia, Sala Superior de Ponce, para la continuación de los procedimientos de manera consistente con lo aquí resuelto.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri concurre sin opinión escrita.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo